Amusement Securities Corporation, Plaintiff, *v.* Academy Pictures Distributing Corporation and Others, Defendants.*

Supreme Court, New York County, June 27, 1936.

* Affd., 250 App. Div. 710.   See, also, Id. 749.

Krellberg & Fitzsimons [*Alfred S. Krellberg, Cyril S. Landau* and *Arthur J. Homans* of counsel], for the plaintiff.

*Fitelson & Mayers* [*H. William Fitelson, Bertram A. Mayers* and *I. Jack London* of counsel], for the defendants.

*Bernard Hershkopf*, substituted, for the Ameranglo Corporation.

*Greenbaum, Wolff & Ernst* [*Jerome Handler* of counsel], substituted, for the Midtown Theatre Corporation.

HOFFMAN (HERMAN), Referee. Plaintiff, as the owner of a photoplay known as " White Zombie," first exhibited in 1932, is seeking to enjoin the exhibition of an alleged rival picture, recently produced, and now being exhibited under the name of " Revolt of the Zombies." Plaintiff also seeks damages and an accounting for profits. It has joined as parties defendant not only the owners and producers of " Revolt of the Zombies," but also a corporation holding the distribution rights to the picture in the metropolitan district of New York and northern New Jersey, a sales agent representing the producers in territories outside of the United States, Canada and Alaska, a company which has financed the producers and printed the positive film, and a New York city exhibitor.

A motion for an injunction *pendente lite* was withdrawn pursuant to a stipulation which provided for an immediate trial of the issues before a referee, and all the issues were accordingly referred to me to hear and determine.

### THE PLEADINGS.

The complaint sets forth the acquisition of the rights to the photoplay " White Zombie " by plaintiff from the Halperins and the corporation controlled by them by a contract made on July 15, 1932; that " White Zombie " was widely advertised; was distributed by United Artists Corporation, a distributor widely and favorably known in the moving picture world; was a tremendous popular success and as a result the name " White Zombie," and

particularly the word " Zombie " in that name, has become associated in the public mind in the United States and foreign countries with the play owned by plaintiff; that plaintiff is reissuing " White Zombie " and advertising it as a reissue; that defendants Academy Pictures Distributing Corporation, Victor Halperin and Edward R. Halperin are distributing and have entered with others into arrangements for the distribution of a picture known as " Revolt of the Zombies;" that the defendant Melbert Pictures, Inc., a moving picture exchange, has licensed Midtown Theatre Corporation, the owner of the Rialto Theatre in New York city, to exhibit said moving picture at its theatre and has granted similar rights to other persons; that the defendant Midtown Theatre Corporation is about to exhibit said picture; that the defendant Producers Laboratories, Inc., has an agreement with the defendant Academy Picturers Distributing Corporation for the manufacture and distribution of positive prints of said picture; that defendant Ameranglo Corporation is distributing said picture in foreign countries outside of the United States and Canada; that the title " Revolt of the Zombies " was adopted in bad faith and for the purpose of capitalizing upon the good will attached to plaintiff's picture, and competes unfairly with it in that the titles are so similar as to be likely to be confused in the public mind and in other respects.

The action has been discontinued as to defendant R. K. O. Film Booking Corporation by stipulation, and no reference need be made to the allegations in the pleadings concerning it.

The answers admit that defendants Edward R. Halperin and Victor Halperin are the principal officers, directors and stockholders of the defendant Academy Pictures Distributing Corporation, the company which produced " Revolt of the Zombies," and are the principal officers and directors of Halperin Productions, Inc.; that Halperin Productions, Inc., produced in 1932 a photoplay under the title " White Zombie;" that Academy Pictures Distributing Corporation, Victor Halperin and Edward R. Halperin have produced and are distributing the picture known as " Revolt of the Zombies;" that defendant Midtown Theatre Corporation has been licensed by defendant Melbert Pictures, Inc., to exhibit said picture at the Rialto Theatre; and that defendant Producers Laboratories, Inc., has contracted with defendant Academy Pictures Distributing Corporation for the manufacture, distribution and sale of positive prints of said picture. In other respects they deny the material allegations of the complaint. The answers also set forth as a first affirmative defense that the word " Zombie " is a word in common use; that it was used as a part of titles of earlier literary and dramatic productions; that it has no

secondary meaning; and that, therefore, plaintiff has no exclusive right thereto. As a second affirmative defense, they state that in September and October, 1935, there were negotiations between plaintiff and defendant Academy Pictures Distributing Corporation looking towards the financing by plaintiff of a series of eight pictures which defendant Academy contemplated producing; that the "Revolt of the Zombies" was the second of eight pictures thus listed; that thereafter, although plaintiff knew the "Revolt of the Zombies" was being produced, and contracts for its exhibition were being entered into, no complaint was made until a short time prior to the commencement of the action, and that these acts constitute a waiver of and estop plaintiff from setting up any rights it may have to the word "Zombie" in the title. As a third defense, the facts set forth in the second defense are alleged to constitute laches.

The defendant Victor Halperin was not served with the summons and complaint herein, and no answer was served or filed on his behalf. At the conclusion of plaintiff's case, counsel for defendants Edward R. Halperin and Academy Pictures Distributing Corporation took the position that as a result the court had no jurisdiction over said defendant. However, it appears that the firm of Fitelson & Mayers, Esqs., in appearing in opposition to the motion for a preliminary injunction herein, named Victor Halperin in the initial paragraph of the answering affidavit of H. William Fitelson, Esq., verified May 27, 1936, as one of the defendants for whom they were appearing. The cover on the answering affidavits is indorsed "Fitelson & Mayers, attorneys for defendants except R. K. O. Film Bookings and Producers Laboratories." In connection with said motion for a preliminary injunction, said firm of attorneys appeared in open court for all of the parties defendant so mentioned in the answering affidavits, and thereafter submitted a proposed order in which, on page 2, there is the following: "And after hearing * * * H. William Fitelson in opposition thereto, on behalf of all of the defendants except R. K. O. Film Booking Corporation."

The cover of said proposed order was indorsed "Fitelson & Mayers, attorneys for defendants except R. K. O. Film Booking Corporation." It will be noticed that the indorsement on the cover of the answering affidavits excludes two defendants whereas the cover on the proposed order excludes only one. That shows a consciousness respecting the defendants for whom said attorneys had authority to act, and argues against inclusion by inadvertence. The appearance of said attorneys in the manner aforesaid was an appearance on the merits, constituted a voluntary general appear-

ance within the purview of section 237 of the Civil Practice Act, was equivalent to personal service, and subjected the defendant Victor Halperin to the jurisdiction of this court. (*Braman* v. *Braman*, 236 App. Div. 164; *Franklin* v. *Lee*, 233 id. 592; *Equitable Trust Co.* v. *Halim*, 133 Misc. 678.)

## FACTS.

" Zombie " is a name given by certain primitive, superstitious colored peoples, particularly in certain sections of Haiti, to disinterred human corpses endowed by sorcery with power to carry out in a mechanical way the wishes of the sorcerer. It is sometimes also applied to the supernatural power or essence which these superstitious practitioners believe may enter and reanimate the dead body. An article of the Penal Code of Haiti makes the practice of Zombieism a criminal offense.

The setting of the picture " White Zombie " is an old town in Haiti. The story hinges upon the efforts of a master of the Zombies, that is, a sorcerer, who is supposed to have power to create and control Zombies, who has been enlisted on behalf of a white person competing unsuccessfully for the love of a certain young lady. The master, by the exercise of hypnotic powers, gives the young lady the appearance of death. She is then buried, disinterred by the Zombies under his control, and placed under his domination. Ultimately, the spell of the master is broken, the Zombies cease to carry out his orders, and the young lady is restored to her former self.

By a contract made on July 15, 1932, Halperin Productions, Inc., Edward R. Halperin (incorrectly referred to in the title of this action as Edward J. Halperin) and Victor Halperin, the owners and producers of a talking photoplay named " White Zombie," for a substantial consideration which ultimately netted them about $80,000, assigned to plaintiff the exclusive right to distribute and exploit that picture throughout the world for a period of ten years. In that contract the producers warranted that they were the owners of the play and of every element entering into its composition and production; that the play in no respect trespassed upon the rights of any one, and that they would indemnify and hold the assignee harmless if it did. In the grant to plaintiff of said rights in the picture there was specifically included " the right to reissue said motion picture or photoplay throughout the world." The assignors further agreed that they would not at any time grant or attempt to give to any one " any rights  *  *  *  which will in any manner derogate from or compete with the rights granted *  *  *  to Amusement Securities hereunder." They further

agreed " that no material used in said photoplay shall be used in any other photoplay or photoplays."

Plaintiff, about the same time that it obtained said exclusive distribution rights, arranged with United Artists Corporation to co-operate with it in the distribution of " White Zombie." Large sums of money were spent by plaintiff and United Artists Corporation in advertising and promoting the picture. All parties agree that it proved a large box office attraction and a financial success. It was widely played throughout the United States in 1932, 1933 and 1934, and was and is being produced in foreign countries. At the present time plaintiff, by reason of a reassignment to it by United Artists, is the owner of the United States distribution rights to that picture, and has commenced reissuing it.

On or about February 10, 1934, there was a conference between Edward R. Halperin, Victor Halperin and their father, Robert L. Halperin, on the one hand, and a representative of plaintiff corporation on the other. The result of it was that for a consideration of $5,000 paid by plaintiff to Robert L. Halperin, to whom there had been a mesne assignment by his sons of their rights in the contract of July 15, 1932, there were executed and delivered contemporaneously four separate instruments. One was a contract between the plaintiff and Robert L. Halperin, whereby there was quitclaimed to plaintiff any and all rights which the said Robert L. Halperin had in " White Zombie," including " the title and story thereof." The second instrument was a quitclaim assignment and transfer to plaintiff herein by Halperin Productions, Inc., of all of its rights in and to " White Zombie," including specifically " the title and story thereof." This assignment was accompanied by a warranty to the effect that, except for certain enumerated matters of no importance in this litigation, the assignor had in no way incumbered the title with an incumbrance which was still in force. The third instrument was an assignment by Victor Halperin and Edward R. Halperin to plaintiff of all of their right, title and interest of any nature in and to " White Zombie," " together with the title and story thereof." This assignment was accompanied by the warranty as to incumbrances identical with that contained in the assignment executed by Halperin Productions, Inc. The fourth instrument was a release executed by plaintiff, a copy of the essential part whereof reads as follows: " That in consideration of the assignment dated February 10, 1934, signed by Victor Halperin and Edward R. Halperin, and other valuable consideration, receipt whereof is hereby acknowledged, the undersigned, Amusements Securities Corporation, a corporation, does hereby forever waive, surrender and release the said Halperin

Productions, Inc., Victor Halperin and Edward R. Halperin, and each of them, from any warranties, representations, conditions, covenants, agreements, or agreements to defend, or any other agreements, made in the agreement of July 15, 1932, between Amusement Securities Corporation and Halperin Productions, Inc., Victor Halperin and Edward R. Halperin, relative to their rights or the title to the said motion picture photoplay titled and known as ' White Zombie ' including but not limited to all negative and positive prints and films of every kind and all sound track, as well as musical recordations and all additions and improvements in and to the said motion picture photoplay, together with the title and story thereof, as well as the motion picture, stage, radio, television, literary and other rights therein and thereto, including but not limited to any and all copyrights taken out or which may be taken out in the United States or elsewhere in and to said motion picture photoplay and/or the title and story thereof, or any claims or claim that has been made or may be made relative to the right or title to the aforementioned."

In October, 1935, the defendants Victor Halperin, Edward R. Halperin and Academy Pictures Distributing Corporation submitted to plaintiff a list of eight tentatively-named photoplays which they wished to produce *seriatim*. The first picture on the list was " The Thrill of a Century," the second " Revolt of the Zombies." Said defendants tried to interest plaintiff in financing their production. The negotiations on behalf of the defendants mentioned were carried on by a Mr. Benjamin Solomon, their acknowledged representative. In the course of these negotiations a proposed contract was prepared by plaintiff's attorneys. That instrument, had it been signed, would have created an obligation on the part of plaintiff to finance merely the first of the eight pictures mentioned, which at the time bore the title " The Thrill of a Century," and would have given plaintiff certain optional rights with respect to the other pictures mentioned. However, it was never signed, and plaintiff was apprised in November, 1935, that the Halperins and Academy had made financing arrangements with others. Said abortive transaction has been made the basis of a suit in the City Court of New York city by plaintiff herein against the Halperins and Academy as defendants.

The facts hereinbefore set forth are fairly undisputed. The record contains proof entitled to credit that plaintiff's representative, in October, 1935, at the time of said abortive negotiations for financing, cautioned defendant Academy's representative that they had no right to use the word " Zombie " in the title of the second of the list of eight pictures discussed tentatively entitled

" Revolt of the Zombies;" that a discussion concerning the matter then took place, and that plaintiff's representative stated that if the agreement proposed by plaintiff were entered into, it would give the prospective profits to be derived from it due weight in considering whether to permit the use of the word objected to, but that it was not necessary to decide that then and there because the only picture seriously dealt with and whose production was then anywheres near the horizon was the first one on the list, namely, " The Thrill of a Century." The defendant Edward R. Halperin denies that his New York representative, an officer of the defendant Academy, ever relayed any such conversation to him, but admits that at that time the title " Revolt of the Zombies " was tentative and that he had four different stories to select from for use under that or a similar title. However, that representative, who was called as a witness on behalf of defendants, would not categorically affirm or disaffirm the conversation claimed by plaintiff, the substance of his testimony being that he had no definite recollection on the subject.

The one who agreed to finance the Halperins, after the deal with plaintiff fell through, was Producers Laboratories, Inc. After financing arrangements had been completed defendants Edward R. Halperin, Victor Halperin and Academy proceeded with the production of " The Thrill of a Century." It was renamed " I Conquer the Sea " before it was released. On March 9, 1936, they began producing " Revolt of the Zombies." Plaintiff claims that it did not know of that fact until the middle of April, 1936, and did not see defendant Academy's press book until about May 1, 1936. The picture was completed in California on or about April 20, 1936. Prints thereof were immediately shipped to New York city for distribution. Producers Laboratories, Inc., had not only financed the production of " Revolt of the Zombies " but had also done the laboratory work thereon and manufactured the positive prints thereof, and is the central point for distributing such prints to various distributors.

The defendant Academy, in June, 1935, entered into a contract with defendant Melbert Pictures, Inc., a corporation engaged in distributing motion pictures in the metropolitan district of New York, including northern New Jersey, for the distribution of the projected photoplay " Revolt of the Zombies " in that area. In that contract Academy expressly reserved the right to change the name of the picture prior to releasing it. Melbert Pictures has been distributing press books and has engaged in other advertising of " Revolt of the Zombies " to the trade. Two of the exhibitors booked by it, one in New York city and the other in Newark,

N. J., were exhibiting the said picture during the course of the trial; the others have been notified not to play it.

The defendant Midtown Theatres Corporation is the owner of the Rialto Theatre located at Forty-second street, corner Broadway, New York city. It, pursuant to a contract with defendant Melbert, has been and is now exhibiting the picture " Revolt of the Zombies " at its said theatre. The exhibitions commenced on May 28, 1936. On May 14, 1936, plaintiff sent Midtown a warning letter.

The defendant Ameranglo Corporation is a New York corporation engaged in selling distribution rights to American pictures in foreign countries. In June, 1935, it entered into a contract with defendant Academy whereby Ameranglo would, as sales agent for Academy, obtain foreign distribution for certain pictures produced by Academy, among them the " Revolt of the Zombies." Acting in that capacity it had obtained, in August, 1935, on behalf of its principal, a contract with Pathe Pictures, Limited, of London, England, for the distribution of " Revolt of the Zombies " in England, and had also been conducting negotiations for its distribution in several other countries. The negatives of " Revolt of the Zombies " were not shipped to England until some time in April, 1936, and the picture has not yet been trade-shown there. The law of England bars exhibitions prior to trade-showing. There is evidence that that law is frequently disregarded; but none that the picture has actually been shown there. The agreement with Pathe expressly excludes any warranty as to the " availability or right to use of the title."

Pursuant to the stipulation of the attorneys representing the respective parties, I viewed exhibitions of " White Zombie " and " Revolt of the Zombies." It appears, and the fact is abundantly confirmed by the evidence in the record, that the two motion pictures differ as to theme, subject-matter, locale, and in many other respects. They are similar in that they both have the word " Zombie " in their titles and in that they involve characters termed " Zombies." However, in " White Zombie " the Zombies are disinterred dead persons revived by the spell of a master, while in " Revolt of the Zombies " they are living persons subjected to the hypnotic spell of a master.

### Right to Use of Word " Zombie."

It is argued by defendants that the word " Zombie " is a descriptive one and does not lend itself to exclusive appropriation by any one. I am not satisfied that the word " Zombie " is a purely descriptive word in the sense employed in the trade-mark decisions. It is true that words which describe certain subject-matter or some

feature or function thereof are not available as trade-marks. Yet some descriptive words are available as trade-marks. In *Le Blume Import Co.* v. *Coty* (293 Fed. 344) the Circuit Court of Appeals for the Second Circuit upheld Coty's trade-mark " Origan " as applied to toilet preparations. " Origan " is an old English name of a plant not common in the United States. The use of the word had in the United States for many years been confined to druggists and botanists. The court held that a word which is not in common use and is unintelligible and non-descriptive to the general public, although it may be known to linguists and scientists, may properly be regarded as arbitrary and fanciful and capable of being used as a trade-mark or trade name. Said the court (p. 358): " We think that a word which is not in general or common use, and is unintelligible and non-descriptive to the general public, although it may be known to linguists and scientists, may properly be regarded as arbitrary and fanciful and capable of being used as a trade-mark or a trade-name."

The word " Zombie " is one which until recently was used only by some obscure primitive peoples and was known only to the few travelers who made studies of these peoples. Concededly, it has never, prior to its use in the title " White Zombie," appeared in the title of any motion picture. It was first used in the United States in the title of a play published in 1929, but not produced, and also in the title of a play which was produced for about two weeks in the Biltmore Theatre in the spring of 1932, but neither the first publication of 1929 nor the play produced in the spring of 1932 gained any public favor or gave the word " Zombie " any real currency. The word did not appear in the editions of Webster's New International Dictionary prior to 1935. The various editions of Funk & Wagnall's Dictionary define the word " Zombi " as " a fantom or ghost." The first comprehensive definition of the word appears in the 1935 unabridged edition of Webster's New International Dictionary as follows:

" Zombi — also Zombie— plural—bies. Kongo ' Zumbi '— fetish

" (a) Originally in West African voodo cults, the deity of the python; hence, in Haiti and the southern United States, the snake deity of voodo rite. A hierarchy is sometimes recognized of the Grand Zombi and various lesser zombis.

" (b) The supernatural power or essence which it is believed may enter into and reanimate a dead body; also, a corpse so reanimated.

" A Zombi * * * is a soulless human corpse, still dead, but taken from the grave and endowed by sorcery with a mechanical semblance of life,— it is a dead body which is made to walk and act and move as if it were alive.— W. B. Seabrook.

"Zombiism — Belief in the zombi; also, practice of the rites performed in connection with the worship of the Zombi."

Defendant's witness Mooney admitted that the word had no general meaning in the English language and that not one person in a hundred knew what it meant. Defendant's witness Crawford, also an expert of many years experience in the moving picture business, said that he did not know what a "Zombie" was. It might, therefore, be seriously urged that the word "Zombie" is subject to appropriation as a trade name.

However, plaintiff does not base its claim in the premises upon the Trade-Mark Law (U. S. Code, tit. 15, § 81 *et seq.*). It is predicated upon alleged unfair competition which as to defendants Halperin and their instrument, Academy, is aggravated by a violation of a contractual duty as well.

Where a party to an action seeks to invoke the aid of a court on the ground of unfair competition the burden is upon him to prove that he has certain property rights entitled to protection; that defendants compete with or otherwise affect adversely those rights; and that defendants' conduct is unfair in the sense that it seeks to use or appropriate plaintiff's fame, celebrity or good will for personal advantage.

A careful consideration of the voluminous record herein has led to the conclusion that the play "Revolt of the Zombies" competes unfairly with the plaintiff's play known as "White Zombie."

Although the defendants have challenged the accuracy of plaintiff's principal witness that "White Zombie" has thus far had a box office gross of close to $1,750,000, there is no question but that the essential part of that witness' testimony in the record of "White Zombie" is true, namely, that substantial sums of money running into many thousands of dollars have been spent by plaintiff and United Artists Corporation in advertising and creating good will for the photoplay "White Zombie," and that it has enjoyed a widespread popularity throughout the United States and in foreign countries, making the name "White Zombie," and particularly the word "Zombie," therein widely and favorably known, and associating it in the mind of the public with the character of a play in which "Zombies," *i. e.*, dead persons endowed with the power of mechanical action subject to the will of a master mind, form the mainspring of action and background in the play, and has yielded substantial profits to the owners. Confirmation of that fact is to be found in the advertising of defendant's play "Revolt of the Zombies," which contains the following:

"Pre-sold to the public through their remembrances of 'White Zombie;' pre-sold to the exhibitor through the never-to-be-forgotten profits of 'White Zombie.'

"Following in the million dollar profit tracks laid down by 'White Zombie.'"

Although there was considerable clash of opinion among the experts testifying on the subject, I am satisfied that the play "White Zombie" has substantial value as a reissued photoplay. The record shows that, while the reissue of a photoplay is like the original issue, a speculative matter, a considerable number of reissues have proved successful and lucrative. It was pointed out that very often the success of a reissue is attributable to special factors, such as the popularity and renown of a particular member of the cast. Defendants' experts were obliged to admit that Bela Lugosi, who took the principal part in "White Zombie," and one Karloff are the two outstanding stars now playing the principal parts in horror pictures going to voodooism and other primitive superstitions for their source material and themes, and that Bela Lugosi, who attained great popularity in playing the leading parts in the successful photoplay "Dracula," as well as in "White Zombie," has a great appeal to that part of the public which likes plays of that character. It would seem, therefore, that, while it is not possible to appraise with any degree of certainty the returns which "White Zombie" would yield as a reissue, were it not for the appearance of "Revolt of the Zombies," it may be fairly concluded that, were it not for that competition, "White Zombie" would constitute a valuable property right.

"White Zombie," it should be borne in mind, has other than reissue rights. It is still being exploited by United Artists on behalf of plaintiff in foreign countries, where it apparently has not yet exhausted itself as a first issue, and there is the possibility of plaintiff's developing a sequel under the same or a similar name as was done in the case of "The Gold Diggers."

That "Revolt of the Zombies" competes with "White Zombie" hardly requires any extended analysis. In foreign countries they will presumably compete for the same theatres. In the United States, while "White Zombie," as a reissue, would likely be played in no less than 3,000 of the 10,000 available theatres, that is, those of the 15,000 in the United States in which it has not yet been played, it would, in attempting to book those theatres, meet with competition from "Revolt of the Zombies," and, even if the two are played in different theatres in the same locality, there is apt to be, by reason of the similarity of titles and some of defendants' advertising which is taken from and fits "White Zombie" rather than

"Revolt of the Zombies," confusion of identity of the play in the minds of the theatre-goers, and damage to "White Zombie." "Revolt of the Zombies" having been advertised as a sequel to "White Zombie" destroyed plaintiff's opportunity to develop a real sequel to it.

Even some of defendants' witnesses have admitted that the word "Zombie" is the dominant or all-important word in the title "Revolt of the Zombies," and that it acquires that dominance and importance by reason of the wide and favorable publicity which the word acquired as the result of its association with the title "White Zombie" in the minds of the public by reason of its successful and widespread showing. The word "Zombie" has thus, in the eye of the law, acquired a secondary meaning, that is, one suggestive of the particular play, "White Zombie." By reason of the presence of this word in both titles there is considerable likelihood that the two photoplays will be confused, and that defendants, under a colorable imitation of plaintiff's title, will appropriate the good will inherent in that name. In fact, one newspaper commentator actually referred to defendants' picture as "White Zombie."

The possibility of confusion arising from similarity of names is not all, however. Defendants have designedly enhanced that possibility many-fold. They have avowedly set out in other ways to encroach upon and capitalize for their own advantage the good will inherent in plaintiff's photoplay in a most unconscionable manner. They have, in advertising "Revolt of the Zombies," reproduced striking cuts and important advertising material almost identical with that used in advertising "White Zombie." In most of the posters the words "White Zombie" appear in heavy or otherwise prominent type calculated to catch the unwary eye which looks only at headlines and nothing else. In one poster they stand out more boldly than "Revolt of the Zombies." The defendants' witness Crawford stated that a comparison of some of the advertising material used in both plays shows "clearly, certainly" that some of the "White Zombie" advertising was used for the "Revolt of the Zombies." Although the "Revolt of the Zombies" has absolutely nothing to do with Haiti and none of its action takes place there, nevertheless, in advertising it, defendants quote article 249 of the Penal Code of Haiti, forbidding and penalizing the practice of Zombieism in the same fashion that that article is quoted and publicized in the "White Zombie" advertising. There is no digging up of dead natives in "Revolt of the Zombies" as there is in "White Zombie." Nevertheless, the "Revolt of the Zombies" advertising falsely says: "Once more audiences are taken to Haiti

where the Penal Code provides death for those who make a practice of digging up so-called dead natives and bringing them back to life to enslave them in the sugar mills and plantations."

Similarly, it speaks of a " Recreated role of Murder " — a character in " White Zombie," when there is no such role in the " Revolt of the Zombies." The latter picture is advertised as a " sequel " to " White Zombie." Sequel is commonly defined as " a continuing and concluding portion as of a story, a final chapter or the like." " Revolt of the Zombies " is, strictly speaking, by reason of the differences hereinbefore set forth, not a sequel of " White Zombie." There is no link between the two stories either in the way of theme or identity of characters developed. Even the word " Zombie " has a different meaning in the two photoplays. The record shows that the press book of " White Zombie " was copyrighted, and one of defendants' expert witnesses stated that he, as an advertising man, would refrain from using any copyrighted matter, but the primary defendants openly and brazenly have sought to and have appropriated to their own use some of this advertising matter which for a valuable consideration they sold to plaintiff, and have sought in every way to use such substance and fame as inhere in " White Zombie " for introducing and passing off its play to the public, under a false guise and without regard to the effect which that type of confusing advertising might have upon the business which plaintiff has built up and which is known as " White Zombie."

Defendants have not offended in announcing to the world that their play was produced by the same organization which produced " White Zombie." That is a truth and they have a right to state it. The essence of their offense lies in a studied simulation of a business name which has acquired special significance by reason of its wide association in the minds of moving picture goers with a successful photoplay — plaintiff's play — in short, a name which has come to symbolize good will and in the use of advertising matter belonging to plaintiff and fitting plaintiff's play and not defendants' as a means of decoying some of the good will which " White Zombie " has. The story of " Revolt of the Zombies " and its episodes are unlike " White Zombie." The guise is too much the same. This unfair conduct appears all the worse in the case of the Halperins and those privy to them in that it constitutes a plain effort to reach out and whittle down something previously granted by them for which they have received substantial consideration.

We thus have here all of the elements which the law considers necessary to make out a case of unfair competition. (*National Picture Theatres* v. *Foundation Film Corp.*, 266 Fed. 208; *Underhill* v. *Schenck*, 238 N. Y. 7; *Warner Bros. Pictures, Inc.*, v. *Majestic*

*Pictures Corp.*, 70 F. [2d] 310; *Eureka Productions, Inc.*, v. *Intimate Theatres, Inc.*, 248 App. Div. 692. See, also, discussion in *Maison Prunier* v. *Prunier's Restaurant & Cafe, Inc.*, 159 Misc. 551.)

In *National Pictures Theatres* v. *Foundation Film Corp.* (*supra*), plaintiff by mesne assignments became, in December, 1919, the owner of a motion picture play entitled " Blind Youth," based upon a dramatic composition by the same name copyrighted in June, 1919. While the moving picture was in process of production, defendant advertised its intention to produce a picture play to be known as the " Blindness of Youth," based on a French play, which was dissimilar as to subject-matter and incidents, except that both dealt with misadventures incident to youthful inexperience. There, the appellate court, in reversing an order denying the motion for preliminary injunction, pointed out that, though the name as such is not protected by the Copyright Act, and may be of such character that it is not eligible as a trade-mark, a play which has become favorably known to the public through the efforts of the owners and those to whose rights they have succeeded, is a business unit, a property right, of which the title forms an integral part, and that an unfair attack upon that property, no matter at which sector it is directed, will not be tolerated by a court of equity.

In *Warner Bros. Pictures, Inc.*, v. *Majestic Pictures Corp.* (*supra*) it was held that plaintiff, the owner of a picture play, " The Gold Diggers," and of a sequel, the " Gold Diggers of Broadway," was entitled to an injunction against a competitive play under the name " Gold Diggers of Paris." The reasoning of that case is similar to that of *National Picture Theatres* v. *Foundation Film Corp.* (*supra*).

The court's reply to one of the arguments by defendant in *Warner Bros. Pictures, Inc.*, v. *Majestic Pictures Corp.* (*supra*) applies with great force in the present case. It was there contended that the motion play called " Gold Diggers of Broadway " had run its course and spent itself, and that, therefore, the name " Gold Diggers," as applied to a play, became common property, and that plaintiff had no more exclusive right to it as used in the sequel " Gold Diggers of 1933 " than had defendant in calling his play " Gold Diggers of Paris." The same argument has been made in the instant case. The court there, in rejecting that argument, held that, because the words " Gold Diggers " had become associated in the minds of the public as descriptive of the play of which Avery Hopwood was the author, there was the same reason for protecting complainants in their use in a new production based upon the old play as there was in the protection accorded to a common-law trade-mark of a clothing manufacturer who puts out a new style under

the old trade-mark. Consequently, there is in the present case to be considered not only the reissue value of " White Zombie " but plaintiff's rights to put out a sequel or new version with the dominant word " Zombie " forming part of the title.

In *Eureka Productions* v. *Intimate Theatres, Inc.* (*supra*), an injunction was sought to restrain the use of the word " Ecstasy " as part of the title of the photoplay " Ecstasy of Young Love " by the owner of the photoplay " Ecstasy," never before shown in the United States. The Appellate Division reversed an order denying the motion for a temporary injunction and granted the motion.

The position of the plaintiff here is stronger in an important respect than that of plaintiffs in *National Picture Theatres* v. *Foundation Film Corp.* and *Warner Bros. Pictures, Inc.*, v. *Majestic Pictures Corp.* (*supra*), as regards the Halperins and those who stand no better than they, because it has standing not only by reason of the good will appertaining to the play " White Zombie " and the unfair competition therewith, but also by reason of the contractual right to the exclusive use of the title, theme and subject-matter and the other elements constituting the photoplay " White Zombie " which it derived from the Halperins. By the agreement of July 15, 1932, the defendants Halperin and Halperin Productions, Inc., granted to plaintiff for a period of ten years all rights in the picture " White Zombie," including specifically " the right to reissue said motion picture or photoplay throughout the world." They further agreed not to grant, or attempt to grant, to any one any right " which will in any manner derogate from or compete with the rights granted plaintiff," and " that no material used in said photoplay shall be used in any other photoplay or photoplays." Subsequently, on February 10, 1934, assignments were for additional consideration executed by Robert L. Halperin, Edward R. Halperin and Victor Halperin and Halperin Productions, Inc., whereby they transferred to plaintiff complete title to the photoplay " White Zombie," and specifically included " the title and story thereof " in the transfer.

Defendants now seek to impeach that title and to justify their conduct, *first*, by saying that others have used the word " Zombie " as the title of a literary production before it was used as the title of the photoplay which they sold for sums totaling in excess of $80,000 to plaintiff; *second*, by arguing that the title, being descriptive, is not a property right of which the court will take cognizance, and *third*, that if any restraint was created by the agreement of July 15, 1932, defendants have been freed from that restraint by virtue of the provisions of the release which was deliv-

ered to them by plaintiff simultaneously with the execution and delivery of said three other instruments on February 10, 1934.

The argument that there are or may be others who have better rights than plaintiff is not entitled to serious consideration. As was well said by the court in *National Picture Theatres* v. *Foundation Film Corp.* (*supra*, p. 211), in answer to this claim based upon an identical state of facts: " The court below rightly gave no weight to the defense based on Byers' registration of a play, named as is defendant's. Whatever may be Byers' rights, unfair competition is a trespass, and no trespasser can justify by setting up the right of one to whom he is a legal stranger."

Similarly, defendants in this case may not seek shelter in any rights which any stranger to this proceeding may have. That is particularly appropriate if we bear in mind the representations as to title contained in the agreement of July 15, 1932, between defendants Halperin and plaintiff, on the strength of which plaintiff was induced to part with a substantial consideration as well as defendant Edward R. Halperin's letter to S. S. Krellberg and plaintiff, dated October 15, 1932 (Plaintiff's Exhibit 26).

As to Property Rights — Release — Estoppel — Laches.

We come now to the argument that the title " White Zombie " was not of a character which would enable one to acquire a property right therein worthy of the protection of a court of equity, and that plaintiff, as the assignee of defendants Halperin, has no greater standing than they had originally. The answer is simply that defendants Halperin and those who stand with them are not in a position to urge this contention. They have, in return for a large sum, purported to transfer certain things described in that contract as valuable rights. They will not be heard to say that their act of grant was a nugatory gesture. They will not be permitted to take back without consideration and contrary to the interests of their grantee anything which will tend to minimize that grant. They have assigned to plaintiff not only the play " White Zombie," but also specifically the title thereto, the material used in its production and distribution, and the reissue rights. Plaintiff's efforts and expenditures have added value thereto. Defendants will not, in derogation of their grant, be now permitted to subject that title and the play it identifies to a course of conduct on their part which may diminish its value and conflict with its reissue and other potentialities. (See *Underhill* v. *Schenck, supra*, p. 14.)

It may be admitted that the words " materials used " and the other language in the assignments should not be given an interpretation which will put one of the parties at the mercy of the

other. In other words, they should not be construed so as to exclude, for example, the defendants from producing a photoplay having to do with voodooism. The words should be given a meaning consonant with the intention of the parties as gathered from the entire instrument and from the circumstances surrounding its execution, and no restrictions upon defendants should be drawn therefrom which are not necessary for or strictly commensurate with the protection required to assure plaintiff the full and proper enjoyment of the property rights transferred to it. Bearing these principles in mind and admitting that certain situations might present difficulty in applying them, there can be little doubt but that the conceded lifting of a good deal of the advertising material used in promoting " White Zombie " and using it in advertising " Revolt of the Zombies," and the title " Revolt of the Zombies " constitute unfair competition and are an encroachment upon the prior grant.

It is claimed by defendants that, by the release (Plaintiff's Exhibit 33, but first offered in evidence by defendants), delivered on February 10, 1934, running from plaintiff to defendants Victor Halperin and Edward R. Halperin, all rights that the plaintiff might have had under the agreement of July 15, 1932, have been completely wiped out. I am unable to agree with that contention.

We shall disregard the technical consideration that the affirmative defense of release was not pleaded, and will consider the pleadings amended in that respect to conform to the proof. Both sides to the controversy offered the instrument in evidence. It is before the court. The case was tried at great length. The record, exclusive of the numerous exhibits, contains more than 1,000 pages of testimony. It would be unjust to do otherwise. (*Marine Trust Co. of Buffalo* v. *Willis*, 240 App. Div. 176.) Turning to the merits of the plea and examining carefully the release, which was drawn by the attorney for Robert L. Halperin, we see that it is drawn inartistically. We can, nevertheless, arrive at a reasonable construction thereof by applying the well-established principle that an instrument is to be construed in a reasonable manner and where ambiguous against the draftsman. Reading the instrument in the light of the foregoing considerations, I conclude that the instrument released Halperin Productions, Inc., Victor Halperin and Edward R. Halperin only from such warranties or other agreements or undertakings contained in the agreement of July 15, 1932, as relate to representations made or covenants entered into concerning their right or title to the motion picture " White Zombie," and to any claims which have been or might be made arising from any such warranties. It does not in any way subtract from or minimize the grant theretofore made. If it is borne in mind that

long prior to the execution of the release the two Halperins and Halperin Productions, Inc., by an assignment dated July 29, 1932, transferred all of their right, title and interest in and to the agreement between them and plaintiff, dated July 15, 1932, to Robert L. Halperin, father of the two Halperins, it can hardly be contended that the release was intended to do anything more than create a bar to any action based upon warranty of title. It was not intended and did not release them from their covenant not to use any of the material used in " White Zombie " in any other photoplay. But, be that as it may, the grants contained in the agreement of July 15, 1932, retain their full force and effect even if all the covenants and warranties are erased and cease to have any force or effect. Those grants were reiterated in the instruments drawn up on February 10, 1934, and such grants, even though they be unaccompanied by any restrictive covenant, create a duty to refrain from doing the things which defendants have done here. That obligation is sometimes based upon the principle that a man may not derogate from his own grant sometimes deemed the result of an implied contract to abstain. (*Trego* v. *Hunt*, L. R. [1896] A. C. 7.) One who has sold the good will of a business may, even in the absence of a restrictive covenant, be restrained from trespassing upon that good will. (*Tierney Sons, Inc.*, v. *Tierney Bros., Inc.*, 130 Misc. 428, and cases cited therein.) In the *Tierney* case the defendants, whose family name was Tierney, were restrained in the absence of such a covenant from using the name Tierney as part of a business name in unfair competition with their assignee to whom they sold the stock of plaintiff corporation.

Defendants contend that the court is barred from considering the contracts and assignments whereby plaintiff acquired its rights to " White Zombie " from the Halperins because no action for breach of contract is pleaded and no effort was made to amend the complaint in that respect. Were it vital to a just disposition of this case, I would be minded to consider the complaint amended by simply restating as a second cause of action the identical facts therein now set forth and adding thereto the legal conclusion that they constitute a breach of contract (Civ. Prac. Act, §§ 105, 245-a, 432; Rules Civ. Prac. rule 166; *Gallagher* v. *Perot*, 122 Misc. 845; *Wilson* v. *Moon*, 240 App. Div. 440), particularly in the light of defendants' offer of the release. However, such amendment is not indispensable. The contracts and assignments are properly before the court as evidence and a measure of the rights which plaintiff acquired from the Halperins. No objection was made at the trial that they were not properly pleaded. Defendants were neither surprised nor prejudiced by their introduction. It is true

plaintiff has not in its complaint stated the conclusion of law which it might have that the facts set forth as to the defendants Halperin and their privies make out not only a case of unfair competition but also of breach of contract. But while that might prevent the court from concluding that plaintiff has made out a separate cause of action for breach of contract, it does not preclude the court in dealing with the one cause stated in the complaint — that of unfair competition — from considering all the circumstances brought out upon the trial, and one of these circumstances — and an important one — is that the defendants Halperin specifically sold to plaintiff for a substantial consideration the very title and advertising matter they now seek to simulate.

Laches is no defense in a cause where a cause based upon unfair competition is established. Laches, used in the sense of mere delay, is available as a defense only in actions lying in equity's exclusive jurisdiction, not where equity comes to the aid of a legal right. (*Rosenberg* v. *Rosenthal*, 135 Misc. 282, and cases there cited.)

The facts herein do not make out the defense of estoppel. It is undisputed that in October, 1935, there were negotiations between plaintiff and defendants Halperin in the course of which it was brought to plaintiff's attention that defendants Halperin contemplated producing a series of plays and that the tentative title of one of them was " Revolt of the Zombies." The record supports plaintiff's contention that at that time plaintiff complained to defendant Academy's acknowledged representative concerning the use of the word " Zombie " in the second play mentioned, and that the matter was thereafter left in abeyance because the negotiations were concerned primarily and almost entirely with the financing of the first play mentioned in the list of eight which was submitted, namely, " The Thrill of a Lifetime," the production stage of the other plays being considered remote at the time of said negotiations. The record further shows that quite frequently the title given plays even tentatively or while they are in work is changed before they are released. For example, the first of the list of eight plays which was submitted during said negotiations and which at the time was entitled " The Thrill of a Century " was released under the name " I Conquer the Sea." The financing negotiations between plaintiff and defendants Halperin proved abortive, and plaintiff was apprised in November, 1935, that the Halperins were making or had made another deal. There is proof that plaintiff's representative had no knowledge that " Revolt of the Zombies " was being produced until he had seen a large advertisement thereof in the trade press in April, 1936, and that he did not see the " Revolt of

the Zombies " press book until about May 1, 1936. He warned a representative of Melbert on meeting him in April not to take up the picture for distribution. Testimony on behalf of defendants was given to the effect that there were previous advertisements in other trade publications announcing that the picture was in the process of production. They had begun filming the play on March 9, 1936. Plaintiff's representative denied having seen any of these notices. But even if he had, he was under no duty to assume that defendants, after they had been cautioned concerning the proposed title, would persist in using it and release the finished picture under it, when in its contract with distributors, which had been shown plaintiff, it reserved the right to change the title. It also appears that, when plaintiff's manager discovered in April last that the picture was about to be released, the brother of said manager, one of the counsel for plaintiff and familiar with its affairs, was in London. This is corroborated by defendants' witness Barrett, who met him there at the time. After the return of said attorney from England, letters of warning were sent to defendants Academy, Midtown and Melbert. That was in the middle of May, 1936. The action was begun by the service of process on May 25 and 26, 1936.

There would seem to be nothing in this conduct on the part of plaintiff to estop it from asserting such rights as it may have. In *Rosenberg* v. *Rosenthal* (*supra*) plaintiff had delayed much longer. Nevertheless, it was held that he was not estopped from setting up his rights and obtaining equitable relief in the form of an injunction.

In *Hogg* v. *Scott* (L. R. 18 Eq. Cas. 444) the defendant Scott in 1868 wrote and published a work entitled " The Orchardist." He had pirated and embodied therein much from plaintiff's book called " Fruit Manual." In October, 1869, plaintiff wrote for and obtained a copy of defendant's book. He only glanced at one chapter. But the court assumed for the purposes of the case that he had read it all. In 1872-73 defendant published a second enlarged edition of " The Orchardist," which contained the piracies of the first. In August, 1873, suit was brought to enjoin the printing and selling of " The Orchardist," for damages and for an accounting. In holding that plaintiff was entitled to relief, the court disposed of the argument that plaintiff was barred because for a considerable time he stood by and permitted the defendant to incur expenses, by holding that the mere omission to take any proceedings at law or in equity for a time is not in itself an encouragement to defendant amounting to an equitable bar to the protection of a legal right, and that plaintiff's knowledge that the defendant was advertising

and selling his work did not amount to that description of acquiescence in the defendant's dealing with the subject-matter which must be taken to deprive the plaintiff of the help of a court of equity as from any given time.

I am accordingly constrained to find that plaintiff is entitled to injunctive relief, damages and an accounting for profits, together with the costs and disbursements of this action. The defendants and each of them, their respective officers, agents, servants and employees and others acting for them, or any of them, should be forever enjoined and restrained from manufacturing prints, distributing, releasing, advertising, publicly exhibiting, trading in or licensing or permitting others to do any of the foregoing as regards the motion picture entitled " Revolt of the Zombies " in its present or any amended or changed form so long as it bears the title " Revolt of the Zombies " or any other title of which the word " Zombie " or any simulation thereof forms a part, and from using or exhibiting any posters or other advertising containing cuts, slogans, headlines or other similar material taken from " White Zombie " or tending to identify " Revolt of the Zombies " with it or stating that " Revolt of the Zombies " is a sequel to " White Zombie."

All of the defendants are participating actively in making possible the financing, producing, advertising, distributing and exhibiting of " Revolt of the Zombies " — some in one capacity, some in another or others. They had knowledge of the contents of the press book and other projected advertising of " Revolt of the Zombies." That advertising was sufficient to put them on notice that the good will appurtenant to " White Zombie " was being exploited for the benefit of the new picture from which they were all seeking to profit. Prudence should have prompted them to inquire whether the owners of " White Zombie " had consented. If they failed to do so they were proceeding at their peril. The unfair competition now conducted against " White Zombie " is the common result of which they together constitute the producing cause. They should answer in damages for the injury done. The amount thereof which plaintiff may recover is fixed in the sum of $7,500.

The situation here is such that proof of damages with any degree of accuracy is not to be expected. That, however, is no ground for denying damages where they have accrued, particularly as there is evidence in the record on the amount of damage plaintiff has sustained. (See *Underhill* v. *Schenck, supra,* at p. 17, where the court, also dealing with a moving picture case, pointed out that damages resulting from unfair competition can seldom be traced with even approximate precision, and that, nevertheless, that is not a reason for denying them.)

With respect to the accounting for profits, plaintiff may have an interlocutory judgment providing for a hearing before me at a convenient time to the parties to take proof with respect thereto.

The motion to strike out the evidence of Ligon Johnson is denied, and all motions to dismiss the complaint are denied.

The findings have been passed upon. Submit decision and judgment on one day's notice.