Walter A. Lynch, J.
The action is for a permanent injunction and other varied relief. Findings of fact and conclusions of law have been waived.
The first cause of action is directed against the defendants Iandoli and Beading-Sinram-Streat Coals, Inc., the last-men *294 tioned party being hereafter referred to as Beading. Therein a decree is sought enjoining and restraining these defendants permanently from using the name Sinram in connection with the corporate name of defendant Reading in the fuel oil business in the metropolitan area of New York City or in the State of New York, and also for an accounting.
Sinram Brothers, Inc., the original predecessor of plaintiff, was organized as a corporation in March, 1919. Until 1929 this corporation was engaged exclusively in the sale and distribution of coal. In the latter year, 1929, the Marnis Oil Company, a subsidiary of Sinram Brothers, Inc., was organized. Between 1929 and 1952 Sinram Brothers, Inc., and its subsidiary Marnis Oil Company, sold both coal and oil. In June, 1952 Sinram Brothers, Inc., sold its coal business to a corporation known as the Chester Operating Company. Chester continued the operation of this coal business through a division known as the Sinram-Reading Coal Division of the Chester Operating Company. This situation endured until May, 1954, when Chester purchased the Streat Coal Company, Inc., which it continued to operate as a separate division until December 31, 1954, when it merged the operations of the two operating divisions into a single new corporation known as the Reading-Sinram-Stre.at Coals, Inc. This it continued until December, 1955. On December 8, 1955 Lewis Iandoli, Inc., was organized, and on December 19, 1955, said corporation changed its name to the defendant Reading-Sinram-Streat Coals, Incorporated. On the same day the original Reading-Sinram-Streat Coals, Incorporated, changed its name to R. S. S. Incorporated. Also on December 19, 1955, the original Reading-Sinram-Streat Coals, Inc., sold certain of its assets and business to the present defendant, Reading-Sinram-Streat Coals, Inc.
On October 9, 1953, Sinram Brothers, Inc., changed its name to the Sinram-Marnis Oil Co., Inc. On June 16, 1954, this original Sinram-Marnis Oil Co., Inc., sold all its stock to the Metropolitan Petroleum Corporation. Thereupon certain of the assets of the original Sinram-Marnis Oil Co., Inc., having to do with the operation of the retail oil business in New York, were then sold to a new corporation organized at the same time under the name Sinram-Marnis Oil Co., Inc., the plaintiff in this action.
The testimony adduced upon the trial indicates that plaintiff and its predecessors have been in the oil business since 1929. It advertised in trade publications; its name was painted on its trucks; it employed salesmen to sell its oil; it serviced oil-burning equipment for its customers, and it and its predecessors *295 have built up, over the years, a good will as a going and prosperous concern under the use of the name “Sinram” or “ Marnis ”, which is Sinram spelled backwards. In June, 1952, as heretofore adverted to, Sinram Brothers, Incorporated, sold its coal business to the Chester Operating Co., Inc., under the terms of a contract which was received in evidence and marked plaintiff’s Exhibit 1. Paragraph 3 of this contract reads as follows: “In consideration of the agreement to purchase the aforesaid real estate, barges and other personal property by the party of the second part, the party of the first part hereby agrees not to re-enter the coal business in New York City for five (5) years from the date of this agreement; and, in return for this covenant, the party of the second part agrees not to enter the fuel oil business in New York City for the same period of time.” The parties to this agreement and their successors duly carried out the provisions of this covenant not to compete until December, 1955. Then the defendant Iandoli, through various inter-corporate transactions, purchased the business of the defendant Reading. It becomes pertinent, at this point, to note that Iandoli is the president and sole stockholder of the defendant Blue Ridge Fuel Company, which is engaged in selling both coal and oil in the metropolitan area. This company, hereafter referred to as Blue Ridge, is also the sole stockholder of the defendant Reading.
The witness Tewalt worked from 1952 to 1956 for the Chester Operating Company and its successor corporations as general manager. This witness testified that until July 1, 1956, neither the original Reading-Sinram-Streat Coals, Inc., nor its successor, the defendant Reading, ever sold a gallon of oil. No salesmen were employed to sell oil and no trucks were owned by these corporations to deliver oil to customers. In conversations between Tewalt and Iandoli between November or December, 1955 and June, 1956, the entry of the defendant Reading into the fuel oil business was discussed. In this regard the testimony of Tewalt is pertinent:
“ Well, we discussed on different occasions how we would enter the fuel business, whether we would enter into it under the name of Reading-Sinram-Streat Coals or whether we would make it a separate division or operated under a separate name; obviously, the most convenient thing to do was to operate under the name that was already in existence. But in arriving at that decision, I did remind Mr. Iandoli that there was in existence this original covenant or agreement. Whether it would apply or not I did not know. I mean, when I say this *296 covenant or agreement, that paragraph to which we referred a moment ago which stipulated that the coal company was restricted from using the name Sinram in the retail fuel business.
“ Q. Now, during the conversations which you had on this general subject of entering into the fuel oil business, did you deliver at Mr. Iandoli’s request the complete file of the Chester and Sinram-Marnis deal which was in your possession? A. I did.
“ Q. And this contract was in that file, was it not? A. That’s right.
“ Q. Now, at the time you had these conversations with Mr. Iandoli about entering into the fuel oil business, the defendant Iandoli owned and controlled the defendant Blue Ridge, did he not? A. That’s right.”
The foregoing testimony, received without objection, places the covenant of the June, 1952 agreement before the court on the question of knowledge thereof which is binding on the several defendants.
With reference to the relevancy of this contract and the covenant contained therein the defendants assert (1) that the plaintiff is not suing on the contract, and (2) that in view of the fact that neither the plaintiff herein nor any of the defendants were parties to the agreement, nor acquired their businesses subject to the June, 1952 agreement, there can under no possible circumstances be any reliance thereon by plaintiff. As to the first of these contentions it may be here stated that the covenant contained in the June, 1952 agreement has a relevancy bearing on the fact that a predecessor of the defendant Reading bound itself by a solemn compact not to enter the fuel oil business for a period of at least five years, and that even at the time of the trial herein this period had not expired. Therefore, for any rights flowing to the plaintiff from this contract on the question of knowledge of the covenant contained therein by the defendants, plaintiff’s Exhibit I is validly before the court (see Amusement Securities Corp. v. Academy Pictures Distr. Corp., 162 Misc. 608, affd. 250 App. Div. 710, affd. 277 N. Y. 557).
In this connection, i.e., the question of knowledge of this covenant on the part of the various defendants, it is here proper to add that (1) defendant Blue Ridge was and is engaged in both the coal and fuel oil business; (2) at the time of the acquisition of Reading by Iandoli he knew that Reading was using the name “ Sinram ” and sold only coal; (3) prior to the purchase of the Reading corporation Iandoli knew that the salesmen who were selling coal for that business were also *297 selling oil as employees of the plaintiff; (4) defendant Iandoli has owned the defendant Blue Ridge corporation for two and a half years prior to the time of trial, yet only “ moderately ” expanded Blue Ridge’s oil business while embarking intentionally on a planned course of conduct to sell oil under the name of Sinram despite his knowledge of the covenant contained in plaintiff’s Exhibit I. Iandoli denies knowledge of this covenant but the testimony in the case and the reasonable inferences to be derived therefrom clearly establish that he knew of this restriction when he purchased the defendant Reading.
As to the second objection to the admission of plaintiff’s Exhibit I, the objections therein set forth are not of controlling significance. In Lewis v. Gollner (129 N. Y. 227, 234), the Court of Appeals stated: “ [T]here is a difference between the present case and those in which the contract purpose is to prevent competition-, a difference which respects the nature and character of the injury resulting from a breach; but that difference does not disturb the doctrine common to both, that in a proper case, equity will specifically enforce by affirmative decree or restraining injunction a definite and fully-established and valid contract, although a personal one, and irrespective of the fact that it happened to be by parol.” (Emphasis supplied.) In the same case the court further declared: “ But if the contract remains technically a personal one, I think the reasonable and settled doctrine is that the contract equity is so attached to the use of the land which is the subject matter as to follow the land itself into the hands of a purchaser with full knowledge of all the facts, who buys with his eyes open to the existing equity, and more especially when he buys for the express purpose of defeating and evading that equity.” (P.236.) In the Lewis case herewith quoted from, the covenant related to real estate. The rule, however, is the same with regard to personalty ; and in this connection the case of Murphy v. Christian Press Assn. Pub. Co. (38 App. Div. 426, 429) becomes apposite. There the court, per Cullen, J., observes: “ The agreement on the part of the defendant’s predecessor in title, though technically a personal one, related to the use of its property, the copyrights and the plates, and obligated all who might acquire that property with notice of the agreement. This is the settled doctrine of the Court of Appeals where the agreement relates to real estate. (Hodge v. Sloan, 107 N. Y. 244; Lewis v. Gollner, 129 id. 227.) We can see no reason why the same rule should not apply in the case of personal property, nor are we wanting in authority to sustain the proposition.
*298 (New York Bank Note Co. v. Hamilton Bank Note Co., 83 Hun 593; 28 App. Div. 411; Littlefield v. Perry, 88 U. S. 205.) ” (Emphasis supplied.)
It may here be observed that the defendants repudiate the contract of June, 1952 in its entirety. They therefore may not obtain any benefit accruing from it. Having repudiated it and breached it by using the name “ Sinram ” in the oil business, they are therefore relegated to such rights as they would have dehors the agreement and under the common law. Upon the state of facts adduced upon the trial they have no rights under the common law to use the name “ Sinram ” in their oil business.
On this branch of the case, namely, the first cause of action, the plaintiff is entitled to an injunction restraining the defendants permanently from using the name “ Sinram ” in connection with the corporate name of defendant Beading in the fuel oil business in the metropolitan area and in the State of New York. Under this cause of action plaintiff is also entitled to an accounting of profits to be taken before a referee to be designated by the court in the interlocutory judgment.
The second cause of action is based upon attempts to lure certain salesmen away from plaintiff’s employment and into that of defendant Beading. The court finds that the defendant Iandoli, acting for himself and on behalf of the defendant Beading, sought to persuade the named members of plaintiff’s sales force to breach their contracts of employment with plaintiff and to go over to the employ of defendant Beading. All of the salesmen named in this cause of action are under contract to plaintiff and injunctive relief may be had to restrain interference with such contract employees (cf. Richard Krause, Inc. v. Gardner, 99 N. Y. S. 2d 592). Accordingly, the defendants Iandoli and Beading are permanently enjoined and restrained from interfering with the members of plaintiff’s sales force who are under contract to plaintiff, from attempting to secure any of said employees to breach their contracts of employment with plaintiff, and from enticing away from plaintiff any of said salesmen and securing for the defendant Beading the services of said employees.
The third cause of action set forth in the complaint charges the defendants Beading and Iandoli with having attempted and with continuing to attempt to entice away the customers of plaintiff who are under contract. It is also asserted that the named defendants have actually enticed away and secured the business of some of the said customers.
*299 On this branch of the case the plaintiff produced no evidence of the existence of customers actually under contract. It is undoubtedly true that plaintiff has a large number of customers, but plaintiff has seen fit to ask, in this cause of action, relief only with reference to contract customers. Accordingly, defendants are entitled to a dismissal of this cause of action.
The fourth cause of action is against the defendants Beading, Blue Bidge and Iandoli. Therein it is sought to restrain the named defendants permanently from carrying on any acts, scheme or plan attempting to destroy plaintiff’s business and to secure for defendant Beading plaintiff’s business, including, but not limited to (a) use of the name “ Sinram ” by defendant Beading in the fuel oil business; (b) attempting to entice away any of plaintiff’s employees; (c) attempting to secure any of plaintiff’s customers for defendant Beading; and (d) painting the trucks of the defendant Beading with yellow, white, silver or similar letters thereon; and, lastly, damages.
Damages under this cause of action have been waived by the plaintiff. On the trial, at the beginning thereof, defendants’ counsel moved to dismiss this cause of action. Beplying to this application, plaintiff’s counsel stated: “I will point out that we do not believe in the complaint that we are asking for damages as such. We are asking that they be enjoined solely, which, I believe, is on the equity side.” While this cause of action contains various allegations of conspiracy, such allegations are not controlling upon the question of the granting of appropriate relief.
“ The conspiracy or combination is nothing so far as sustaining the action goes; the foundation of it being the actual damage done to the party.” (Hutchins v. Hutchins, 7 Hill 104,107-108.)
“ Where the action is brought against two or more as concerned in the wrong done, it is necessary, in order to recover against all of them, to prove a combination or joint act of all. For this purpose, it may be important to establish the allegation of a conspiracy. But if it turn out on the trial that only one was concerned, the plaintiff may still recover, the same as if such one had been sued alone.” (Hutchins v. Hutchins, supra, p. 107.)
In de Ronde v. Bell (116 App. Div. 191, 193) the court, per Ingraham, J., states: “ but the common action of the defendants is not a part of the cause of action, and although the plaintiff fails to prove such combination or conspiracy upon the trial as to all of the defendants, he is entitled to recover against those who joined to do the act which caused the injury; *300 or, if he fails to show any such combination, he can recover against the defendant who was guilty of the wrong.”
So that, if we were to look behind the corporate veils of Blue Bidge and Beading (Quaid v. Ratkowsky, 183 App. Div. 428, affd. 224 N. Y. 624) and consider the actions of all the defendants named in this cause to be those of Iandoli, proper relief could be provided so long as harm has been done or is reasonably to be apprehended, regardless of any allegations of conspiracy. However, the court is of the opinion, upon all the evidence adduced herein, that any restraint imposed should be upon all three of the parties defendant in this cause of action. Under this cause the court finds as a fact that the defendants Iandoli, Blue Bidge and Beading engaged in a course of conduct whereby Beading was projected into the fuel oil business, unlawfully using the name “Sinram”; that through the use of the name “Sinram” defendant Beading secured many customers who formerly dealt with plaintiff for fuel oil. The figure approximates 25% and the court finds that defendants have attempted to entice away the principal salesmen of plaintiff.
As to the painting format or design of the fuel oil delivery trucks of defendant Beading, it appears from the evidence that New York City Fire Department Begulations require the tank and rear bucket compartment of all fuel oil trucks to be painted dark green (§ 21-1), so that a substantial portion of each oil delivery truck operating on the city streets must be painted in this color. This renders simulation somewhat more difficult of detection than would ordinarily be the case. However, consideration of the evidence on this branch of the matter as a whole leads to the conclusion that injunctive relief should be denied therein, except, of course, as to the use of the name “Sinram” painted on any of defendants’ trucks.
Under the fourth cause of action, therefore, defendants should be enjoined permanently from carrying on any acts, scheme or plan attempting to destroy plaintiff’s business and to secure for defendant Beading plaintiff’s business, including but not limited to (a) use of the name “ Sinram ” by defendant Beading in the fuel oil business; and (b) from attempting to secure any of plaintiff’s customers for defendant Beading through use of the name “ Sinram
The evidence adduced herein clearly points up the fact that defendant Iandoli knew, at the time he purchased Beading, that he was buying a business which was gradually succumbing to the encroachments of the fuel oil industry. In his own direct testimony Iandoli says that in November, 1955, he had *301 a conversation relative to the purchase of Reading with a Mr. Denari, a director of plaintiff corporation. In this conversation Iandoli told Denari that one objection he had to purchasing was the fact that Reading sold coal only. Another objection was that Reading had salesmen who sold coal for Reading and oil for Sinram-Marnis. Yet Iandoli asserts he never undertook to ask the reason for the existence of this situation. With reference to the joint salesmen, Iandoli told Denari that this would result in the salesmen ‘ ‘ liquidating that coal business in favor of Sinram-Marnis, as they converted from coal to oil.” Additionally, it may be noted that, in answer to a question put to him by the court as to whether coal was being used less and less every day, Iandoli stated he was originally in the coal business and was a “ great exponent ” of it and “ I got into the oil business in desperation, because you couldn’t last in the coal business alone.” This witness also testified that he had been 20 years in the coal business in the city of New York. It was also brought out on the trial that Iandoli is president and sole stockholder of Blue Ridge and that Blue Ridge sold both coal and oil. Yet, instead of expanding Blue Ridge’s existing oil distribution facilities, Iandoli purchased a company which sold only coal. Subsequent to the November, 1955 talk with Denari, the defendant Iandoli tried to purchase the business of plaintiff and also tried, through the agency of Tewalt and also by his own efforts, to entice away from plaintiff’s employ and into the employ of Reading certain key salesmen of plaintiff. Failing this, he launched Reading into the oil business.
It is therefore apparent, from the foregoing recital and from the record as a whole, that from the beginning Iandoli knew the value of the name “ Sinram ” in the oil business and deliberately embarked upon a course of conduct calculated to take over for himself plaintiff’s oil business either by purchase of that business directly from plaintiff or by unfairly competing for the said business under the name “ Sinram ”. The purchase of Reading was therefore for the purpose of lending plausibility to the unfair use of the “ Sinram ” part of Reading’s name. Evidencing the intention behind the aforesaid course of conduct are the following facts brought out on the trial. At a meeting held at Iandoli’s home on June 20, 1956, Iandoli informed his salesmen that obviously Sinram-Marnis would be the principal competitor of Reading, that the substantial part of the fuel oil business that they would do would have to come from the Sinram-Marnis’ accounts, that there would be “ no holds barred ” in vying for the business of the *302 customers of Sinram-Marnis, and that, negotiations for the purchase of plaintiff or the transfer of salesmen having failed, “ we would have to do it the hard way ” and would give Sinram-Marnis a “ work-over
Reverting to the first cause of action, the court finds that through the unfair use of the name “Sinram” in the oil business the defendant Reading has secured many customers who formerly dealt with plaintiff for fuel oil and for servicing of oil-burning equipment. According to Iandoli’s testimony, Reading as of December, 1956, had 180 fuel oil customers, of which number approximately 25% formerly dealt for fuel oil requirements with plaintiff. The interlocutory judgment to be entered herein will provide for an accounting for the profits made by defendants from the use of the name “ Sinram ” as part of the corporate name of defendant Reading in the fuel oil business and pay the same to plaintiff.
The ruling made by the court with reference to the objection made by defendants’ counsel at page 136 of the record having been recalled and decision reserved thereon, the court now sustains the objection thereto and grants an exception to the plaintiff.
The foregoing constitutes the decision of the court in accordance with section 440 of the Civil Practice Act.
Settle judgment.