[L. A. No. 21388.   In Bank.   Sept. 28, 1950.]

FREDERICK JACKSON, Respondent, v. UNIVERSAL INTERNATIONAL PICTURES INC. et al., Appellants.

Loeb & Loeb, Adrian A. Kragen, Harry B. Swerdlow and Herman F. Selvin for Appellants.

Wright & Garrett and Harold F. Collins, Amici Curiae on behalf of Appellants.

Harold A. Fendler for Respondent.

Morris Cohn, Richard L. Rykoff, Aubrey I. Finn, Arthur Garfield Hays and Morris Lavine, Amici Curiae on behalf of Respondent.

EDMONDS, J.—Frederick Jackson, the author of a play which was not a theatrical success, sued to recover damages assertedly resulting from the unauthorized use of its title. The principal ground relied upon as requiring a reversal of the judgment in his favor is that the evidence shows no acquisition by the title of a secondary meaning.

The first count of the complaint alleged that Jackson is the author of a play which he entitled "Slightly Scandalous." The play was rehearsed in Los Angeles and produced in Philadelphia and New York with publicity announcing the times of performance. The title thereby acquired a secondary meaning. Later, Universal produced a motion picture under the same title. Universal's distribution, advertising and showing of its picture misled the public and infringed upon Jackson's right in the title of his play. The second count of the complaint alleged that Universal had made a "deliberate, wrongful and unfair misappropriation and use of plaintiff's name and title" in connection with the motion picture. Universal denied these allegations generally.

The evidence presented upon trial may be summarized as follows: Jackson is a writer with about 40 years of experience. He has written plays which were produced in New York and London and sold the motion picture rights to several of them. In 1943, he wrote "Slightly Scandalous." In the following year, while the play was being rehearsed in Los Angeles prior to production, a press agent was employed to publicize it. During the next two months about 40 stories concerning it were prepared and distributed to 550 metropolitan and suburban newspapers.

Only a small percentage of this material was published. A one-inch item appeared in the Hollywood Reporter, a trade journal. It stated that the play would open in Philadelphia and be presented in New York two weeks later with Janet Beecher in the leading role. The Los Angeles Evening Herald-Express, with a daily circulation of 325,000, reported that the author was adding final directorial touches to "Slightly Scandalous" before its initial production in Philadelphia.

Variety, a theatrical magazine having a circulation of 600,000 and sold at newsstands in the principal cities, included reference to the play in a section entitled "Shows in Rehearsal." The Los Angeles Times, which has a daily circulation in excess of 280,000, mentioned in a story concerning another play that the title of the one in which Janet Beecher was to be starred had been changed to "Slightly Scandalous."

Rehearsal would commence in Hollywood immediately, it was said, preparatory to a New York appearance.

The play opened in Philadelphia as scheduled. It was advertised in newspapers there, prior to and during its two weeks run, in space ranging from 10 to 60 lines. The producer also placed 20,000 "heralds" in hotels and restaurants and used outdoor advertising with "24-sheets" on 50 poster boards.

The play ran for almost two weeks in Philadelphia. The drama critics were uncomplimentary, and although the theater was nearly filled to its capacity of 1,500 persons at one performance, attendance at all of the others averaged about 200. The total of the audiences at the 15 performances did not exceed 3,000.

The New York opening followed, but the play closed after seven performances. Advertising was carried by 10 newspapers there in space varying from 12 to 50 lines. But, as in Philadelphia, the newspaper comments were critical and the public showed little interest. In a theater which seated 1,000 there was an average attendance of about 100 at each performance. The play has not since been presented.

A witness for Jackson, after qualifying as an expert, testified that "Some of the most successful pictures have been made of plays that have been flops." Examples were cited. This testimony was corroborated by other witnesses.

To establish a secondary meaning to the title of his play, Jackson presented the testimony of five witnesses. Three of them told the jury that they had seen reviews or advertisements of the play and thought that the picture was based upon it. The testimony of the other two was substantially to the same effect.

Other testimony showed that Jackson's agent requested Universal Pictures to "cover" the eastern production of the play after it had been submitted to that company's West Coast story editor during the period of rehearsal in Los Angeles. A report concerning the play and its reception on Broadway was sent to the company's executive offices.

About two years later, Universal released and distributed throughout the country a motion picture by the same name. It was stipulated that three months before this picture was released, Universal knew of Jackson's play and referred to their attorneys the question as to whether the title "Slightly Scandalous" should be selected for their production. The picture originally carried the title, "Oh Say Can You Sing."

The attorneys for Universal were notified by Jackson's attorney that his client would sue for damages if the title to his play were used.

Jackson does not claim that there is any similarity whatever between the picture and the play. He bases his cause of action entirely upon the use of the title.

The evidence offered by Universal generally is to the effect that the public did not connect the motion picture with Jackson's play and only a handful of people had previously heard of the title. In the company's defense, its witnesses stressed the unsuccessful presentations in Philadelphia and New York.

As grounds for the reversal of the judgment, Universal asserts that the evidence is not sufficient to justify the conclusion that "Slightly Scandalous" had acquired and retained a secondary meaning with relation to Jackson's play. The company also challenges an instruction as incorrect and prejudicially erroneous. Instructions offered by it were erroneously refused, it is asserted, and Jackson's damages in the amount of $17,500 are excessive. It is also claimed that the title was abandoned by Jackson's two-year nonuse of it. Finally, the appellant charges, Jackson's attorney was guilty of prejudicial conduct.

The position of Jackson is that the question as to whether a secondary meaning has attached to a literary or dramatic title is a question of fact. As substantial evidence sufficient to justify the jury's verdict, he refers to the testimony concerning prior use, advertising, and the general impression of the public in New York, Philadelphia and Los Angeles. He also relies upon the statements of his five witnesses that because of the title they associated the play with the motion picture. Nation-wide knowledge of a title is not essential to the acquisition of a secondary meaning, he declares, nor is success of the play a requirement. The correct test, as he analyzes the question, is whether an effect or reaction is created upon the public mind. He also contends that deliberate and unauthorized appropriation of a prior user's name, title or trademark is actionable.

As to the claimed procedural errors, the conduct of counsel was not prejudicial, he asserts, because it was promptly cured by an instruction to the jury. Moreover, the denial of the motion for a new trial was a determination that it did not influence the jury.

The points presented by amici curiae for Jackson are broader

in scope. It is claimed that secondary meaning is established when the title is identified by the general public and it does not depend upon popularity. Although a play is unpopular or "panned" by the critics, unfavorable comments, or any discussion of the play, fixes the title in the mind of the general public as the product of a particular playwright. Moreover, widespread publicity and advertising renders a title valuable and subject to protection entirely apart from rights derived from secondary meaning. The "general public," they say, need only be a substantial number of people not necessarily residing throughout the nation.

An author of a play has no inherent right in the title to his production. (*Paramore* v. *Mack Sennett, Inc.*, 9 F.2d 66, 67; *Martenet* v. *United Artists Corp.*, 56 F.Supp. 639, 640.) Only when the title has acquired a secondary meaning identifying it in the public mind with the play is he entitled to its exclusive use. (*Warner Bros. Pictures* v. *Majestic Pictures Corp.*, 70 F.2d 310, 311; *Amusement S. Corp.* v. *Academy Pictures D. Corp.*, 162 Misc. 608 [294 N.Y.S. 279]; see Nims, Unfair Competition and Trade Marks [4th ed. 1947], § 274-a.) Therefore, regardless of any deliberate use by Universal of "Slightly Scandalous" with knowledge of Jackson's prior use, he is not entitled to damages unless his literary product had acquired a secondary meaning.

There is no initial property right in household semantics or words which are merely descriptive, fanciful or geographic in nature (*G. & C. Merriam Co.* v. *Saalfield*, 198 F. 369, 373 [117 C.C.A. 245]). However, if words have been used by an author or manufacturer in such a manner that the public has learned to associate them with the product, book or play, they acquire a "secondary meaning." This principle, which was first applied in trademark cases, renders the words or symbols protectible and transferable because of that association. A play may become known to the public by its title, which thereby acquires a secondary meaning and attains a protectible status (*Manners* v. *Triangle Film Corp.*, 247 F. 301 [159 C.C.A. 395]; *Hemingway* v. *Film Alliance of United States, Inc.*, 174 Misc. 725 [21 N.Y.S.2d 827]).

In *Johnston* v. *Twentieth Century-Fox Film Corp.*, 82 Cal. App.2d 796, 813 [187 P.2d 474], the court stated, "The question whether a title has acquired a secondary meaning is one of fact." Other decisions to the same effect are *International Film Service Co., Inc.* v. *Associated Producers, Inc.*,

273 F. 585; *Bayer Co.* v. *United Drug Co.*, 272 F. 505, 509; *Saland* v. *Monogram Pictures Corp.*, 67 N.Y.S.2d 436; *Hemingway* v. *Film Alliance of United States, Inc.*, 174 Misc. 725 [21 N.Y.S.2d 827]. The Restatement of the Law of Torts, in stating this rule, adds: "No particular period of use is required." (§ 716b.)

There is substantial evidence in the record to support the implied finding of the jury that "Slightly Scandalous" had acquired a secondary meaning. Jackson's play was publicized in three of the largest cities in this country. The rehearsal and production of the play were announced in dramatic and motion picture journals in Hollywood and New York. Although only about 3,750 persons attended performances of the play, there is no basis for a holding, as a matter of law, that they and the undetermined readers who saw the advertising are not sufficient in number to provide a basis for secondary meaning.

The precise size of this segment of the public is important in connection with the amount of damages which should be awarded, but it does not determine whether the title has acquired a secondary meaning.

This court, in speaking of the word "public," has said that it " '. . . does not mean all the people, nor most of the people, nor very many of the people of a place, but so many of them as contradistinguishes them from a few.' " (*Mary Pickford Co.* v. *Bayly Bros., Inc.*, 12 Cal.2d 501, 514 [86 P.2d 102].) The title of a play produced only in New York may acquire a secondary meaning which entitles it to protection throughout the United States. (*Aronson* v. *Fleckenstein*, 28 F. 75; *Hemingway* v. *Film Alliance of United States, Inc.*, 174 Misc. 725 [21 N.Y.S.2d 827]; *Frohman* v. *Payton*, 34 Misc. 275 [68 N.Y.S. 849].) And the writer of a play recovered damages for the unauthorized use of its title although it was never produced in any city in the United States but had run for some weeks in Paris, France (*Frohman* v. *Wm. Morris*, 68 Misc. 461 [123 N.Y.S. 1090]).

Popularity is not a requirement for secondary meaning because notoriety and adverse discussion may bring about widespread identification of the play by its title and may pique the public interest. Likewise, advertising, even of an unpopular play, may cause the public to identify it as one which has been a "Broadway production."

Although some decisions indicate that the word or phrase constituting the title must have been used ". . . long and . . . exclusively by one producer with reference to his

article . . ." (*G. & C. Merriam Co.* v. *Saalfield,* 198 F. 369, 373 [117 C.C.A. 245]), and, in some cases, the length of the use may be persuasive, the essence of the acquisition of secondary meaning is the impact upon the public mind. "The duration of user required to create a secondary meaning can be measured by no accurate test. In the Yorkshire Relish case the time was twenty-five years, . . . in the Anatolia Licorice case, six weeks. From these instances it will be seen that there is no rule as to the length of time required." (Nims, Unfair Competition and Trade Marks [4th ed. 1947], vol. 1, § 38a, p. 162.)

Judge Learned Hand has said in relation to trademarks that ". . . it is the priority of user alone that controls, even though when the defendant comes into the field, it may not be fully established or even be enough established to become largely associated in the public mind with the plaintiff's mark. Were it not so, it would be of extreme difficulty to show at just what point in time the mark became associated with the maker in enough of his customer's minds to justify the inference that the defendant's use might have become confusing. Therefore, once his use begins, the rest of the public must avoid his fanciful mark." (*Waldes* v. *International Manufacturers' Agency, Inc.,* 237 F. 502.)

█ Universal claims that, in order to gain secondary meaning, the title must be associated specifically with the author of the play rather than with the play. The contention is unrealistic and contrary to authority. "Secondary meaning may exist between a name and the manufacturer or seller whose identity is not known to the buyer. . . . He [the buyer] does not know its [the manufacturer's] name, or its location, or whether it is a corporation or an individual." (Nims, Unfair Competition and Trade Marks [4th ed. 1947], vol. 1, § 42, pp. 169, 170.)

In all probability only a very small percentage of persons who know something about plays can remember or identify the names of the authors. Usually, advertising and publicity are concentrated upon the title and the actors rather than the name of the playwright. There is no logical basis for holding that a public well acquainted with the title and the play could not confer secondary meaning upon that title merely because of unfamiliarity with the author's name.

█ The question of abandonment falls within the same category; it is one of fact to be determined by the jury upon

substantial evidence. (*International Film Service Co., Inc.* v. *Associated Producers, Inc.*, 273 F. 585; *Goldman* v. *R.K.O. Radio Pictures, Inc.*, 149 Misc. 226 [267 N.Y.S. 28].) In *Goldman* v. *R.K.O. Radio Pictures, Inc., supra*, at p. 29 [267 N.Y.S.], the court stated: ". . . a lapse of 13 years in the use of a title, under the circumstances of this case, raises a question of fact as to whether the title ['The Public Defender'] still retains a secondary significance. . . ."

In the present case, there is evidence that several plays written by Jackson had been sold to motion picture producers, from two to ten years after they were produced in New York. It is also significant that in the United States, copyrights protect literary and dramatic properties for an initial period of 28 years with the right of renewal. The evidence, that Jackson had not produced his play for two years after it had closed in New York, does not compel a holding, as a matter of law, that he had abandoned his rights.

The instruction given at the request of Jackson and attacked as prejudicially erroneous refers to exhibits showing the extent of the advertising in the eastern cities at a total cost of $3,300. It is argued that although the court correctly directed the jury not to allow compensation for this expense, the cost of the advertising charges should not have been allowed in evidence. But the instruction directed the jury to limit its consideration to ". . . the value of the title in question and whether it had acquired a secondary meaning as herein-before defined, as a result of volume or extent of advertising." Considering the instruction as a whole, it correctly presented the applicable rule of law.

The rejected instructions concerned the principle that there is no property right implicit in the name or title of a literary work until a secondary meaning has attached to it. But in at least five different instructions, one of which was requested by Universal, the jury was told that the burden of proving a secondary meaning to the title of his play rested upon Jackson. Read together, they adequately covered the subject.

Considering the issue of damages, the sum of $17,500 does not appear to be excessive. The record includes testimony to the effect that other titles to unsuccessful plays have been sold for larger amounts. The value of property wrongfully taken is a matter for the determination of the jury and the evidence as a whole supports the award in Jackson's favor.

The conduct of counsel attacked as prejudicial was

the cross-examination of an expert witness of Universal. He was asked whether he was prejudiced because his employer "was just held for $25,000 damages in an action [of the same kind]." The objection of Universal was sustained, and the jury directed to disregard the whole incident. Another occurrence, cited as misconduct, involved a quarrel between counsel as to which of them submitted a certain document.

There is no showing that the reference to other litigation was untrue. Considering the record as a whole and the ruling upon the motion for a new trial, it cannot be said that the misconduct was prejudicial.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.