**WILLPAT PRODUCTIONS, INC.,**
**Plaintiff,**

v.

**SIGMA III CORPORATION, Defendant.**

United States District Court
S. D. New York.

Feb. 17, 1964.

Jay Goldberg, James V. Hallisey, New York City, for plaintiff.

Hess, Mela, Segall, Popkin & Guterman, New York City, Robert Schur, William D. Popkin, New York City, of counsel, for defendant.

BONSAL, District Judge.

By a complaint filed on January 9, 1964, plaintiff, Willpat Productions, Inc., instituted this action based on diversity of citizenship to enjoin defendant, Sigma III Corporation, from further distribution of a motion picture being presently distributed by defendant under the title "Thundering Wheels" unless the title is changed, and for damages and an accounting of profits by reason of the use of such title by defendant. Plaintiff subsequently moved by way of an order to show cause for a temporary injunction, which motion was argued on January 14, 1964.

Plaintiff is the producer of a motion picture about stock car racing, entitled "Thundering Wheels". Production of this film was begun in early 1962, and in October 1962 scenes for the film were shot at the Atlanta International Raceway in Atlanta, Georgia, during the running of the "Dixie 400", a major stock car race.

The official souvenir program for the October 1962 Dixie 400 contained a welcome to the cast and staff of Willpat Productions' "Thundering Wheels" from the President of the Raceway, and two pages of pictures and comment about plaintiff's film. Plaintiff states that 8,000 programs were sold at the race. The filming of plaintiff's "Thundering Wheels" at the Dixie 400 was reported in a front page article in the October 1962 issue of Motor Sports Digest, a publication with circulation, according to plaintiff, of 50,000 throughout the United States, and in the October 24, 1962 issue of the Atlanta Constitution. Plaintiff's production was also mentioned in a cocktail party announcement of October 23, 1962, by the Raceway, and during the radio broadcasting of the Dixie 400 over the Racing Network, which plaintiff states consists of 156 stations in the South, Midwest and East with a listening audience of between 10 and 12 million. Plaintiff also claims its film received publicity during the Dixie 400 from a trailer company in Atlanta which furnished a trailer for plaintiff's use, and from hotels in Atlanta patronized by plaintiff's crew and cast. In October and November 1962, three New York daily newspapers each carried a brief item noting the role of one of the actors in "Thundering Wheels", and in the July 1963 issue of McCall's magazine, in an article entitled "Stars of the second generation", "Thundering Wheels" was mentioned as a film in which a starring role was played by the daughter of a star.

Plaintiff's film has been completed, but has not yet been distributed. Plaintiff

states that its cost of production was $125,000. The premiere of the film is scheduled for the spring of 1964 in Atlanta.

Defendant was incorporated in October 1962 for the purpose of acquiring redistribution rights to some 100 motion pictures which had been previously exhibited. Among the pictures so acquired was a film initially released in 1948 or 1949 dealing with stock car racing. This film was originally entitled "The Big Wheel". In April 1963 defendant changed the title to "Thundering Wheels". Defendant states that it made the change because it was dissatisfied with the title "The Big Wheel" and because it owned another picture entitled "Thundering Jets", and thought that with similar names the two pictures might be promoted as a double feature. Since May 1963 defendant has continuously distributed its picture under the new title in several states. Firm dates for future showings of the film have been scheduled through April 1964. Defendant estimates its costs of distribution at $8,900.

Defendant asserts that it did not copy plaintiff's title, and plaintiff has no evidence to the contrary except what it judges to be the implausibility of the coincidence in titles. To illustrate this implausibility plaintiff points to the timing of defendant's actions; to defendant's incorporation on or about October 8, 1962, after plaintiff had begun the production of its film, and to defendant's choice of the title "Thundering Wheels" and the distribution of its film under that title in the spring of 1963, after plaintiff's film had received widespread publicity. Plaintiff adds that the 1963 Yearbook of Motion Pictures reflects no use of the title "Thundering Wheels" as the title of a feature motion picture since 1915.

■ Plaintiff has not shown on this motion that its title "Thundering Wheels" has acquired secondary meaning, or that the public will confuse defendant's picture with plaintiff's. See Underhill v. Schenck, 238 N.Y. 7, 20, 143

N.E. 773, 33 A.L.R. 303 (1924); Saland v. Monogram Pictures Corp., 67 N.Y.S.2d 436 (Sup.Ct.N.Y.Co.1946); Hemingway v. Film Alliance of the United States, 174 Misc. 725, 21 N.Y.S.2d 827 (Sup.Ct. N.Y.Co.1940); Manners v. Triangle Film Corp., 247 F. 301 (2d Cir.1917); Jackson v. Universal International Pictures, 36 Cal.2d 116, 222 P.2d 433 (1950).

Plaintiff's production is an original work which has not yet been released to the public. It is not based on a previously published play or a book of the same title. In Jackson v. Universal International Pictures, supra, heavily relied on by plaintiff, the play "Slightly Scandalous" had been produced in New York and Philadelphia. In Hemingway v. Film Alliance of the United States, supra, "The Fifth Column" had played to audiences in New York and elsewhere.

The only possible source of secondary meaning here is the publicity which plaintiff's picture received while it was being produced. With minor exceptions, this publicity occurred in the fall of 1962, and was connected with the filming which took place at the Atlanta International Raceway. Although the trier of fact may find otherwise after trial, the Court is not convinced that this publicity was sufficient to create any secondary meaning, or that if a secondary meaning was created by the publicity, that the secondary meaning now exists, as it must if plaintiff is to prevail. Ball v. United Artists Corp., 13 A.D.2d 133, 214 N.Y. S.2d 219, 227 (1st Dept. 1961).

Nor has plaintiff shown, as a possible alternative ground for relief, that defendant's use of the title is with the wrongful intent to capitalize on the goodwill and reputation of plaintiff's motion picture, see McGraw-Hill Book Co. v. Random House, Inc., 32 Misc.2d 704, 225 N.Y. S.2d 646, 653 (Sup.Ct.N.Y.Co.1962), although in view of the dates and the other circumstances which underlie the coincidence in titles, plaintiff might make such a showing at the trial.

■ Upon weighing the equities, the Court concludes that the harm to defend-

ant which would be likely to result from the disruption of its distribution arrangements if an injunction were granted pending the trial of the issues is at least as great as the harm to plaintiff which would be likely to result if the injunction were denied. See Blaich v. National Football League, 212 F.Supp. 319, 322 (S.D.N.Y.1962).

Plaintiff has not made the substantial showing necessary to obtain the drastic remedy of a preliminary injunction. Walt Disney Productions v. Souvaine Selective Pictures, 98 F.Supp. 774 (S.D.N.Y.), affirmed, 192 F.2d 856 (2d Cir. 1951).

Plaintiff's motion must be denied.

Settle order on notice.