[Civ. No. 37302. Second Dist., Div. Two. June 21, 1971.]

PINKY TOMLIN, Plaintiff and Appellant, v.
WALT DISNEY PRODUCTIONS, Defendant and Respondent.

## COUNSEL

Hillel Chodos for Plaintiff and Appellant.

Arthur S. Katz as Amicus Curiae on behalf of Plaintiff and Appellant.

Hill, Farrer & Burrill, William S. Scully, Jr., Stanley E. Tobin and E. MacAmos, Jr., for Defendant and Respondent.

## OPINION

**COMPTON, J.**—In 1937, Pinky Tomlin (hereinafter referred to as Tomlin) wrote and subsequently performed a copyrighted song entitled "The Love Bug Will Bite You (If You Don't Watch Out)."

In that same year Tomlin entered into a standard type contract with a music publisher whereby he assigned his rights in the composition to the publisher in return for royalties. Said contract was renewed in 1964. Neither the original publisher nor its successor is a party to this action.

The attribution of strong desires and emotions to the bite of a legendary "bug"[1] had been part of the American idiom long prior to 1937 and in fact several persons had previously copyrighted musical and dramatic compositions with the title "Love Bug." Tomlin's composition, however, unquestionably enjoyed a greater success and popularity than any other similarly titled composition.

In 1969, Walt Disney Productions (hereinafter referred to as Disney), after extensive advance publicity, released for exhibition throughout the United States and foreign countries a motion picture entitled "The Love Bug." This screenplay featured a Volkswagen automobile with human attributes. At this point in history there can be no question but what the term "Bug" had become almost synonymous with the Volkswagen automobile.

---

[1] Persons are often described as having been bitten by "The Golf Bug," "The Acting Bug," "The Gambling Bug," "The Travel Bug," as well as the "Love Bug."

Shortly after release of the picture, Tomlin commenced an action alleging unfair competition and seeking general and exemplary damages as well as an injunction to prevent Disney's further use of the title "The Love Bug."

Tomlin's claim of a protectible property right in the title "The Love Bug" is premised on the contention that, although the title to his song was and is "The Love Bug Will Bite You (If You Don't Watch Out)," through popular usage it became known and identifiable to the public by the shorter title of "The Love Bug." He further contends that as a result of the song's popularity as evidenced by extensive sales of sheet music and recordings and extensive use by the broadcasting media and well known musical performers, the title came to be singularly identified with the song[2] and thus acquired a "secondary meaning."

The title to a literary or musical composition is not protectible by copyright, however, the owner of such a composition has been held to acquire a property right in the title when that title has acquired a "secondary meaning" identifying it in the public mind with the literary work. (23 A.L.R.2d 302, § 19; *Jackson* v. *Universal Internat. Pictures,* 36 Cal. 2d 116 [222 P.2d 433].)

On the other hand, in *Curtis* v. *20th Century-Fox Film Corp.,* 140 Cal.App.2d 461 at page 469 [295 P.2d 62], the court said: "Anyone may use a title if there is no secondary significance. Unfair competition consists in palming off one's goods as those of another. The mere use of a substantially similar title, if not used in such manner as to induce the public to believe that the work to which it is applied is the identical thing which it originally designated, does not constitute unfair competition."

The matter is before us as the result of the granting of a summary judgment in favor of Disney in which the trial court found that (1) Tomlin was not the real party in interest, having made an absolute assignment of his rights to the title of his composition, (2) no likelihood of public confusion could exist as a matter of law between Tomlin's song and Disney's motion picture, and (3) that federal copyright legislation has preempted the power of California to grant the relief Tomlin seeks.

The granting of a summary judgment ". . . is addressed to the sound discretion of the trial court and in the absence of a clear showing of abuse thereof, the exercise of that discretion will not be disturbed on appeal. Therefore, the issue on appeal is whether the trial court abused

---

[2]At the oral argument, counsel for Tomlin for the first time suggested a possible "secondary" identification with Tomlin as a performer as distinguished from an identification with the composition. This contention, however, is answered by *Sinatra* v. *Goodyear Tire & Rubber Co.,* 435 F.2d 711.

its discretion in granting the motion. ■ A motion for a summary judgment raises the issue of whether any triable issues of fact exist. (*Desny* v. *Wilder*, 46 Cal.2d 715 at p. 725 [299 P.2d 257].)" (*Hicks* v. *Bridges*, 152 Cal.App.2d 146 at p. 148 [313 P.2d 15].)

The trial court had before it at the hearing on the motion the pleadings, declarations of the parties, plaintiff's deposition and answers to interrogatories.

Two of the three grounds upon which the trial court based its judgment present questions of law. These are that the federal law has preempted the field and that Tomlin is not a real party in interest.

In the companion cases of *Sears, Roebuck & Co.* v. *Stiffel Co.,* 376 U.S. 225 [11 L.Ed.2d 661, 84 S.Ct. 784], and *Compco Corp.* v. *Day-Brite Lighting, Inc.,* 376 U.S. 234 [11 L.Ed.2d 669, 84 S.Ct. 779], the United States Supreme Court held that when an article is unprotected by patent or *copyright,* a state cannot, through the application of its laws on unfair competition, prohibit the copying of an article nor award damages for such copying.

In each of these cases the district court found plaintiff's patent to be invalid but, by applying state law, awarded damages for and an injunction against unfair competition. The Supreme Court reversed.

The essential rationale of these decisions is that the supremacy clause of the United States Constitution is offended where the states, under the guise of guarding against unfair competition, in effect grant perpetual monopolistic protection to items which fail to qualify for the limited protection afforded by federal patent and copyright laws.

In *Sears* and *Compco* the court was dealing with products that lacked sufficient inventiveness to qualify for patent protection. However, as noted above the court referred to articles unprotected by either patent or *copyright,* and the impact of those decisions on cases such as the one at bar has been recognized.

"Protection of titles under a theory of unfair competition has been rendered seriously questionable by the recent Supreme Court case, *Compco Corp.* v. *Day-Brite Lighting,* . . .

"The analogy to unfair competition protection of titles is obvious. As the lighting fixtures in *Compco* were not subject to patent protection, so titles are not subject to copyright protection. If absence of federal protection of the former constitutes a Congressional policy to permit copying then the same may be said of the latter. Moreover, proof of the element

of secondary meaning in title cases may not take them out of the ambit of federal preemption since in *Compco* the Court accepted the lower court's finding of secondary meaning as to the lighting fixtures but nevertheless held that 'if the design is not entitled to a design patent or other federal statutory protection, then it can be copied at will.' " (Nimmer on Copyright (1970 Supp.) § 34, pp. 142, 143.)

Seymour M. Bricker, in an article entitled *Thirty Months After Sears and Compco,* published in the Bulletin of The Copyright Society of the U.S.A., volume 14, page 296 (1967), aptly observes "The Supreme Court tips the scales in favor of free competition. In Sears and Compco, the Court treats the patent and copyright statutes as exceptions to the policy of a free and competitive economy, and considers that, in a desire to curb predatory business practices, the states may not impose liability for, or forbid, copying of works not protected by the federal statutes. Lawyers in the entertainment field tend to think of creator and user. Sears and Compco bring to mind the obvious—that in the patent and copyright fields, there is a third party, namely, the public."

Admittedly, titles are not presently copyrightable under federal law. It is clear, however, that Congress has the power to protect literary titles under either the copyright or commerce clauses of the United States Constitution and has simply elected not to do so. Can it be inferred from this congressional inaction that the field is totally open or totally closed to protective action by the states?

Some clue to the answer is provided by the following language from *Sears* at page 231:

"An unpatentable article, like an article on which the patent has expired, is in the public domain and may be made and sold by whoever chooses to do so."

In *Compco, supra,* at page 237, the court said:

"To forbid copying would interfere with the federal policy, found in Art. I, § 8, cl. 8, of the Constitution and in the implementing federal statutes, of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain."

Also in the Bulletin of The Copyright Society, *supra,* at page 300, the author states: "To distinguish between copyrightable and uncopyrightable writings would be contrary to the policy of the Constitution and the Copyright Act. Such a distinction would favor the proprietor of an uncopyrightable work by permitting perpetual protection."

*Columbia Broadcasting System, Inc.* v. *DeCosta,* 377 F.2d 315 at page 319, asks and answers the question as follows:

"Does the language in *Compco,* 'whatever the federal patent and copyright laws leave in the public domain', refer to creations that Congress has deliberately chosen not to protect or more broadly to those it has simply not protected, whether by choice or by chance? In the case of patents the two questions are coterminous, for Congress has deliberately chosen not to protect inventions lacking the element of originality, and an invention is thus either patentable or unprotectible. In the case of 'writings' there is no such universal test of qualification. But Congress has established a procedural scheme of protection by notice and registration. The necessary implication of this approach, we conclude, is that, absent compliance with the scheme, the federal policy favoring free dissemination of intellectual creations prevails. Thus, if a 'writing' is within the scope of the constitutional clause, and Congress has not protected it, whether deliberately or by unexplained omission, it can be freely copied. See Cheney Bros. v. Doris Silk Corp., 2 Cir., 1929, 35 F.2d 279."

In *Sears,* at page 232 [11 L.Ed.2d at page 667], the court did appear to reserve to the states a limited area as follows: "Doubtless a State may, in appropriate circumstances, require that goods, whether patented or unpatented, be labeled or that other precautionary steps be taken to prevent customers from being misled as to the source, just as it may protect businesses in the use of their trademarks, labels, or distinctive dress in the packaging of goods so as to prevent others, by imitating such markings, from misleading purchasers as to the source of the goods."

Heretofore California has provided protection to titles on two separate theories (1) the so-called "passing off" theory whereby a competitor was prevented from practices designed to "pass off" his works to the public as if they were those of another (*Curtis* and *Jackson, supra; Gordon* v. *Warner Bros. Pictures, Inc.,* 269 Cal.App.2d 31 [74 Cal.Rptr. 499]) and (2) the misappropriation theory under which the courts recognized a property right in a title which would support an award for damages for misappropriation. This latter theory found expression in the following language from *Johnston* v. *20th Century-Fox Film Corp.,* 82 Cal.App.2d 796 at page 808 [187 P.2d 474]: "However, a person may have a property right and the right to the exclusive use of arbitrary or fictitious or fanciful or artificial or technical names or titles. They have a special significance. They are creations of the mind. Words which are generic and descriptive in their ordinary application may, when not used in a generic or descriptive sense, be the subject of a property right and the right of exclusive use." (Also see Civ. Code, § 980.)

Since *Sears* and *Compco,* the appropriation theory of state protection for literary titles retains no vitality and the "passing off" theory is limited by the following strong and clear language in *Compco, supra,* at pages 238-239: "[T]hat the configuration of the article copied may have a 'secondary meaning' which identifies the maker to the trade, or that there may be 'confusion' among purchasers as to which article is which or as to who is the maker, may be relevant evidence in applying a State's law requiring such precautions as labeling; *however, and regardless of the copier's motives, neither these facts nor any others can furnish a basis for imposing liability for or prohibiting the actual acts of copying and selling.* Cf. *Kellogg Co.* v. *National Biscuit Co.,* 305 US 111, 120 (1938). And of course a State cannot hold a copier accountable in damages for failure to label or otherwise to identify his goods unless his failure is in violation of valid state statutory or decisional law requiring the copier to label or take other precautions to prevent confusion of customers as to the source of the goods." (Italics added.)

■ Thus, California courts may not grant injunctive relief to *prevent* the use of the title of a literary or musical composition nor can it award damages for the *appropriation* of such a title.

The question then is, does our decisional or statutory law require a copier to take precautions to prevent public confusion as to source, and thus permit limited injunctive relief requiring such precautions and the awarding of *special* damages for the failure to take such precautions?

In *Gordon* v. *Warner Bros. Pictures, Inc., supra,* this court found it unnecessary to discuss the preemptive effect of *Sears* and *Compco.*

In that case the author of a novel entitled "The FBI Story" obtained a judgment for damages against Warner Bros. for the production of a motion picture entitled "The FBI Story." Admittedly, the picture was based upon yet another book by a different author which book also bore the title "The FBI Story."

In reversing the judgment for plaintiff the court stated that "There was no evidence from which the jury could infer an intent on the part of defendant to deceive other than its use of the title 'The FBI Story' and *defendant's failure to include in some of its advertisements a mention of [the author] of the book upon which the film was based.*" (Italics added.) (*Gordon, supra,* at p. 38.)

The court went on to say at pages 39-40, that "in order to recover damages, plaintiffs must prove as an essential element of their cause of action that defendant copied the title . . . with the intent to deceive the public into believing that its motion picture was based upon or connected

with plaintiffs' book." This latter requirement of proof was held to bring the action within the area reserved to the states by the language in *Sears* and *Compco*.

Inherent in the language in *Gordon* is the conclusion that a defendant copier can avoid liability by taking reasonable precautions to avoid public confusion by identifying the source of its work or disclaiming any connection with plaintiff's work. Stated conversely, *Gordon* complies with the requirement of *Compco* as *valid decisional law in California requiring such precautions.*[3] (See also *Yellow Cab Co. of San Diego* v. *Sachs,* 191 Cal. 238, 242 [216 P. 33, 28 A.L.R. 105]; *Hoover Co.* v. *Groger,* 12 Cal.App.2d 417, 419 [55 P.2d 529].)

The two possible forms of relief now available must be examined separately.

■ In an action for injunctive relief against unfair competition it is unnecessary to prove fraud. The likelihood of public confusion, albeit innocently created, will warrant such relief. (Civ. Code, § 3369; *Gordon* v. *Warner Bros. Pictures, Inc., supra; Brooks Bros.* v. *Brooks Clothing of California,* 60 F.Supp. 442; *Family Record Plan, Inc.* v. *Mitchell,* 172 Cal.App.2d 235 [342 P.2d 10].) Such relief must be limited, however, to a narrowly drawn injunction requiring appropriate precautions to prevent public confusion and cannot totally prevent the use of a title. (See *Warner Bros. Pictures* v. *Majestic Pictures Corp.,* 70 F.2d 310, for an example of such an injunction.)

■ An action for damages for copying a title which has acquired a secondary meaning requires that the damages be specially pleaded and proved and coupled with a showing that they are the result of (1) a failure of the defendant to take reasonable precautions to prevent public confusion, (2) with the intent to deceive the public as to the source of the literary work.

■ In the case at bar, Tomlin's claim is misappropriation. At the time of Tomlin's deposition his counsel stated that his claim of damages was based on the wrongful use of the title by Disney and that the damages were to be calculated as the reasonable value of such use. Tomlin's complaint prays for damages for the "wrongful taking of plaintiff's property." In his answers to Disney's interrogatories Tomlin stated that his claim for damages arose "from the *unauthorized* use by [Disney] of [Tomlin's]

---

[3]Civil Code sections 3369 and 3370, together with Business and Professions Code section 17500, provide a comparable statutory requirement.

property . . ." (Italics added.) No other claim of damages was presented to the trial court.

Tomlin also seeks a broad permanent injunction against the use of "plaintiff's title" by Disney. This prayer is also clearly predicated upon a theory of misappropriation.

The relief which Tomlin seeks and the theory upon which it is sought cannot be constitutionally countenanced in light of *Sears* and *Compco*.

Tomlin's complaint contains the usual prayer "for such other, further or different relief as to this court may seem just and proper." Thus, it might be contended that the court upon a trial could fashion some relief which would comport with the restrictions of *Sears* and *Compco*.

 Whether that possibility requires that we remand to the trial court turns on the question of Tomlin's showing that (1) "The Love Bug" had acquired a "secondary meaning" and that (2) there was a likelihood of confusion in the mind of the public between his song and Disney's picture, (3) as a result of Disney's wrongful and intentional failure to take precautions to prevent that confusion. The first two elements are interdependent and necessary to support limited injunctive relief. The third element added to the other two is necessary for an award of damages.

This is in the final analysis an action grounded in unfair competition, i.e., a motion picture versus a song.

"In actions of the kind herein involved, it is not necessary that the parties be in market competition . . . the basic fact on which relief is granted is the confusion in the minds of reasonable members of the general public from which an attribution of affiliation results.

"Where the parties engage in the same business in the same locality, the possibility of confusion is so obvious that only these facts need be alleged. The same is true where, although not in direct competition, it appears from the complaint that the two businesses deal in articles or in services so similar that the public might reasonably conclude that plaintiff had merely enlarged the scope of its basic operations. *But we think that, in other cases, a plaintiff should not be allowed to force another businessman into court, or to impose on the time and effort of a busy judicial system, unless it is able to plead and to prove some special circumstances, peculiar to the two businesses involved, from which confusion would be likely to result.*

"One factor considered by the courts in this connection is whether the tradename is within the public domain or whether it is unique, arbitrary or

fanciful. [Citation.] Equity gives a greater degree of protection to fanciful tradenames than it accords to names in common use. [Citation.]

"In the case of *Sunbeam Furniture Corp.* v. *Sunbeam Corp.* (1951) 191 F.2d 141, 144, the court stated that a 'differentiation is made between "strong" and "weak" marks based upon whether the word sought to be protected is general or fanciful.' This difference in degree of protection is true even as to noncompeting businesses. [Citation.] The *Sunbeam* case, *supra,* pointed out that the word 'sunbeam' is a weak mark, and the case of *Perfection Co.* v. *Coe* (1945) 64 F.Supp. 942, 945, indicated that the word 'sun' and representations of the sun were nondistinctive words or marks. . . . It follows that, although the use of a 'strong'—i.e., a fanciful —name may, by itself, be sufficient to show a reasonable probability of public confusion, the use of a weak, generic name, part of the public domain, fails, unless accompanied by additional facts, to raise sufficient probability of confusion to justify judicial relief." (Italics added.) *(Sunset House Distributing Corp.* v. *Coffee Dan's, Inc.,* 240 Cal.App.2d 748, pp. 753-754 [50 Cal.Rptr. 49].)

Against these principles we test Tomlin's claim of a triable issue of fact.

The words "The Love Bug" and the fanciful concept they connote were in the public domain prior to 1937. This title can aptly be characterized as a "weak title."

■ Mere priority of use does not create or establish a "secondary meaning" for a title. (*Gordon* v. *Warner Bros. Pictures, Inc., supra.*)

■ Furthermore, these three words are but a portion of the true title of Tomlin's composition. The only showing in the court below as to the possible "secondary meaning" of the shortened title is found in Tomlin's deposition where he stated that he and others always referred to the title as "The Love Bug" and that when performing he would get requests from the audience such as "Sing the Love Bug."

It is significant to note that the only exhibit produced, a copy of an ad from Daily Variety, May 12, 1937, refers to the song as "The Love Bug Will Bite You."

The parties to this action are not engaged in the same or what could be liberally construed as competing businesses and Tomlin failed to plead or present any "special circumstances" from which public confusion would likely result.

While admittedly the similarity of the markets and the existence of a "secondary meaning" are ordinarily questions of fact, the trial judge was

well within the bounds of sound discretion in finding, upon the showing made here, that there was, as a matter of law, no likelihood of public confusion.

As to the question of whether Disney was attempting to mislead the public into believing that the picture was in some way connected with Tomlin's composition, Tomlin's showing is equally defective.

In his deposition he claims that a few of his friends asked him if the Disney production had a connection with his song and in his declaration he states that he has observed that Disney's advertising of the picture contained no reference to the writer, director or featured performer. From this he concludes that "It thus appears that most of the box office receipts have resulted from the catchy quality of *my title* . . ." (Italics added.)

The uncontroverted declarations offered by Disney establish that the selection of the title for the picture evolved from the winnowing of hundreds of titles suggested by members of the Disney staff all of whom were familiar with the screenplay and the projected market. That market incidentally consisted in large percentage of persons born well after 1937.

Even the most liberal interpretation of Tomlin's presentation at the hearing on the motion for summary judgment fails to establish a triable issue of fact.

■ Finally, the court's finding that Tomlin is not the real party in interest presents a pure question of law.

In 1937, Tomlin executed a contract with his publisher by which he assigned his rights in the composition "The Love Bug Will Bite You (If You Don't Watch Out)." This assignment included the "Title, words and music thereof." In 1964, Tomlin executed a renewal agreement with the successor of the original publisher.

Tomlin now contends that at the time of the original contract the title had not acquired a "secondary meaning," the song being as yet unpublished, and therefore he did not assign his "cause of action" in the instant case. He further contends that a clause in the renewal agreement granting to the publisher the right to make changes in the title is implied recognition that he had originally reserved certain rights to the title. In any agreement whereby a composer sells his rights in an unpublished work, the expectation or at least the hope of the parties is that the composition will achieve great popularity and value. An unqualified assignment of the rights to such composition would include such expectancy.

The contracts here were unambiguous. The song, including the title, be-

came the property of the publisher. An accretion in the value of the property, including the acquisition of a secondary meaning for the title, necessarily belonged to the owner, to wit, the publisher.

"Every action must be prosecuted in the name of the real party in interest . . ." (Code Civ. Proc., § 367.)

In this case that party is not Tomlin but the publisher.

The judgment is affirmed.

Roth, P. J., and Herndon, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 18, 1971.