[No. B029439. Second Dist., Div. Two. June 29, 1989.]

GEORGE LUTZ et al., Plaintiffs and Appellants.
DINO DE LAURENTIIS et al., Defendants and Respondents.

**COUNSEL**

James P. Tierney and Peter J. Anderson for Plaintiffs and Appellants.

Leopold, Petrich & Smith, Louis P. Petrich, Gary L. Swingle, Daniel M. Mayeda, Loeb & Loeb and Albert F. Smith for Defendants and Respondents.

## OPINION

**COMPTON, J.**—Plaintiffs George and Kathleen Lutz, along with other individuals, commenced an action which essentially sounds in unfair competition. Their fourth amended complaint contained numerous counts in which they attempted to couch their claims in theories of tort, breach of contract and statutory violations.

As to many of the counts, the trial court sustained demurrers without leave to amend and entered judgments of dismissal. As to the remainder of the counts, the trial court granted a motion for judgment on the pleadings. Plaintiffs have appealed.

Since we conclude that plaintiffs have adequately pleaded a cause of action for unfair competition, we reverse the judgment of dismissal and remand with directions.

### FACTUAL BACKGROUND

In 1974, one Ronald DeFeo murdered his parents and four siblings in their home in Amityville, New York. In the subsequent criminal prosecution, DeFeo claimed he was "possessed" by demons.

In 1975, plaintiffs George and Kathleen Lutz moved into the DeFeo house with their family and for 28 days allegedly experienced psychic phenomena traditionally associated with a "haunted" house.

After the Lutzes moved out, they hired Jay Anson to write a book, entitled *The Amityville Horror,* about their experiences in the DeFeo home during these 28 days. The book was a national bestseller, selling over three million copies.

In 1977, the Lutzes and Anson entered into an agreement with Professional Films, Inc. (PFI) in which they granted PFI and its assignees the right to produce a motion picture based upon the book, *The Amityville Horror*. PFI was also given the right to use the Lutzes' name in publicizing the film. The agreement reserved to the Lutzes the right to make sequels based upon the events which happened to them *after* they fled the Amityville house.

Following the publication of the book and the execution of the agreement with PFI, the Lutzes commenced an extensive publicity campaign, which

included newspaper and radio interviews, television appearances, college lectures, and travels abroad, to promote the book and its forthcoming cinematic interpretation. During these appearances, the Lutzes also spoke of "the additional unique events and happenings" which occurred after they had left the Amityville house and promised there would be both literary and motion picture sequels depicting those events.

Meanwhile, PFI assigned its rights to American International Pictures (AIP). In 1979, pursuant to the agreement, AIP released the motion picture film entitled *The Amityville Horror*. The movie generated box office receipts in excess of $75 million.

In 1980, the Lutzes contracted with John Jones and Paul Kimatian to write and publish a book about the Lutzes' experiences after they had moved out of the Amityville house. The Lutzes also granted Jones and Kimatian the option to produce a motion picture about those events. In return, the Lutzes received the right to share in the money generated by the book and movie. Jones and Kimatian thereafter partially assigned those rights to plaintiff Gotham Press Publishing, Inc.

In 1981, the book, *The Amityville Horror II,* authored by Jones, was published. This book chronicled the events the Lutz family experienced after leaving the house in Amityville. It was a bestseller and was also published in a serialized form in a national magazine with a weekly circulation of four and one-half million copies.

In 1982, defendant Orion Productions, the successor in interest to PFI, released a movie entitled *Amityville II: The Possession.* This film was produced by defendants Dino De Laurentiis, Dino De Laurentiis Corporation, and Productions, Ltd. The film depicted, in a fictionalized manner, the events which occurred at the house *before* the Lutzes moved into it.[1] In the film's promotional advertising in newspapers, on television and radio, and in movie theaters, defendants used the phrase: "The Night of February 5, 1976, George and Kathleen Lutz and their three children fled their home in Amityville, New York. They got out alive! Their living nightmare shocked audiences around the world in 'The Amityville Horror.'"

In response to defendants' release of *Amityville II: The Possession,* plaintiffs initiated the present action.[2] In order to moot plaintiffs' request to

---

[1] The movie was taken from the book *Murder in Amityville* written by Hans Holzer and published in 1979. The book dealt with the DeFeo trial.

[2] Because George and Kathleen Lutz had declared bankruptcy, they were joined in the action by their trustee in bankruptcy. The other plaintiffs were: (1) Paul Kimatian and John

enjoin distribution of the movie, defendants modified the promotional advertising to eliminate references to the Lutzes and to include the statement: "This film is not a sequel to 'The Amityville Horror.'"

In 1983, defendants released another motion picture called *Amityville 3-D*. Using special effects to give the viewer a three-dimensional perception, this film concerned totally fictitious events set in the Amityville house.

## PLAINTIFFS' CONTENTIONS

Plaintiffs essentially claim that defendants' use of the word "Amityville" in each of the films' titles in conjunction with the designation "II" or "3-D", supplemented by the reference to the Lutzes in the initial promotional campaign for the first film, misled the public into believing its two movies were the sequels to the Lutzes' story and so diluted the value of their sequel that their plans to produce it collapsed.

## DISCUSSION

■ In *Tomlin* v. *Walt Disney Productions* (1971) 18 Cal.App.3d 226, 230 [96 Cal.Rptr. 118] [hg. den.], we held that "[t]he title to a literary . . . composition is not protectible by copyright, however, the owner of such a composition has been held to acquire a property right in the title when that title has acquired a 'secondary meaning' identifying it in the public mind with the literary work. [Citations.]"

■ We there noted that an action aimed at vindicating such a property right could not be based on an "appropriation" theory but could only be based on a theory of public deception or confusion. ■ "An action for damages for copying a title which has acquired a secondary meaning requires that the damages be specially pleaded and proved and coupled with a showing that they are the result of (1) a failure of the defendant to take reasonable precautions to prevent public confusion, (2) with the intent to deceive the public as to the source of the literary work." (*Id.* at p. 235.)

---

Jones, whom the Lutzes had granted (a) the right to write and publish a book chronicling the Lutzes' life after leaving Amityville and (b) an option to produce a motion picture based upon those events; and (2) Gotham Press Publishing, Inc. which had received a partial assignment of the rights granted Kimatian and Jones.

The named defendants included: (1) Orion Pictures Corporation, the successor in interest to the rights granted PFI in 1977; (2) Dino De Laurentiis; (3) Dino De Laurentiis Corporation; and (4) Productions Ltd. Plaintiffs also sued Columbia Pictures Industries, Inc., and EMI, Inc., but those entities are not parties to this appeal.

■ "Reduced to fundamentals, secondary meaning is a shorthand phrase which describes the existence of conditions from which public confusion will flow if the defendant is permitted to pursue his deceptive scheme [citation]. If words have been *used* or *employed* by an author or manufacturer in such a manner that the public has learned to associate them with the thing described, they acquire a secondary meaning [citation]." (*Metro-Goldwyn-Mayer, Inc.* v. *Lee* (1963) 212 Cal.App.2d 23, 30 [27 Cal.Rptr. 833] [hg. den.], italics in original.)

■ On the other hand, "[a]nyone may use a title if there is no secondary significance. Unfair competition consists in palming off one's goods as those of another. The mere use of a substantially similar title, if not used in such manner as to induce the public to believe that the work to which it is applied is the identical thing which it originally designated, does not constitute unfair competition." (*Curtis* v. *20th Century-Fox Film Corp.* (1956) 140 Cal.App.2d 461, 469 [295 P.2d 62] [hg. den.].)

■ Whether words have, in fact, achieved the status of secondary meaning can only be determined after an inquiry into the facts. It cannot be determined at the demurrer stage of the proceedings. (*Dino, Inc.* v. *Boreta Enterprises, Inc.* (1964) 226 Cal.App.2d 336, 339 [38 Cal.Rptr. 167].)

Defendants assert that as a matter of law no secondary meaning could attach[3] because the word "Amityville" is identified with multiple sources as it is the actual name of a town and because the word was used in the titles of several works. The argument misses the mark as those are merely factors to consider in making the *factual* evaluation of whether or not plaintiffs ever acquired a protectible secondary meaning. (See, e.g, *Allied Artists Pictures Corp.* v. *Friedman* (1977) 68 Cal.App.3d 127, 134 [137 Cal.Rptr. 94] ["The question of whether a particular title has acquired a secondary meaning is one of fact."]; *Metro-Goldwyn-Mayer, Inc., supra,* 212 Cal.App.2d at p. 30 ["The sufficiency of public notoriety to establish an association in the minds of the public which will support a finding of secondary meaning is a question of fact."]; and *Johnston* v. *20th Century-Fox Film Corp.* (1947) 82 Cal.App.2d 796, 813 [187 P.2d 474] ["The question whether a title has acquired a secondary meaning is one of fact."].)

■ Because defendants prevailed upon a demurrer and a judgment on the pleadings, the dispositive question is whether plaintiffs have pleaded

---

[3]Defendants have never claimed that plaintiffs in the 1977 agreement authorized them to title and/or publicize their two movies as they did. At oral argument, they specifically disavowed any reliance upon the agreement's provisions to justify their conduct; instead, they merely asserted plaintiffs had failed as a matter of law to establish a secondary meaning.

sufficient operative facts to establish a cause of action. In resolving this question, the allegations in the complaint are to be regarded as true and are to be liberally construed with a view to attaining substantial justice between the parties. (*Rader Co.* v. *Stone* (1986) 178 Cal.App.3d 10, 20 [223 Cal.Rptr. 806]; *Barney* v. *Aetna Casualty & Surety Co.* (1986) 185 Cal.App.3d 966, 973-974 [230 Cal.Rptr. 215] [review den.].)

■ At bench, plaintiffs allege that their extensive promotional efforts, the release of the first movie, and their well-publicized plans to make a movie sequel created a secondary meaning in the word "Amityville" such that defendants' inclusion of that word in the title of their two movies, in tandem with defendants' use of "II" or "3-D" which by custom and practice designate a movie as a sequel, misled the public into believing defendants' two movies were the anticipated sequel about the Lutzes.

Further they allege that defendants intentionally and deceptively titled and advertised the movie to mislead the public into believing the film was the anticipated sequel to the first movie which would chronicle what happened to the Lutzes after they fled their home. In particular, plaintiffs allege the film was initially to be entitled *Murder in Amityville* but that defendants " . . . instituted a plan to change the title to [*Amityville II: The Possession*] with the purpose of trading off of and appropriating for themselves the valuable secondary meaning created by plaintiffs' efforts and expense."

We conclude that plaintiffs have properly pleaded a cause of action for unfair competition.

## CONCLUSION

Here there was one set of operative facts establishing that plaintiffs' right to be free from unfair competition was violated by defendant.

Plaintiffs' attempt to turn their single cause of action into multiple causes of action based on other legal theories was either improper or surplusage. The sustaining of the demurrer and the granting of the judgment on the pleadings was correct as to all counts—save one. (See 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 19, p. 63 et seq.)

The judgment of dismissal is reversed. The matter is remanded to the trial court with directions to vacate its order sustaining the demurrer to a single cause of action for unfair competition as pleaded in count I and

permit plaintiffs to proceed to trial on that cause of action. Plaintiffs to recover costs on appeal.

Gates, J., concurred.

**ROTH, P. J.,** Concurring and Dissenting.—I concur in the court's decision that in this case there can be but one cause of action, for unfair competition. I would, however, also uphold the trial court's determination that plaintiffs cannot, as a matter of law, allege a secondary meaning.

By this action the Lutzes, despite having been unsuccessful in earlier attempts to establish that anyone who writes about Amityville invades their privacy and misappropriates their right of publicity,[1] and despite having surrendered to defendants' predecessors an interest in the copyright in the book written by Jay Anson, are trying out yet another theory to preserve unto themselves the exclusive right to tell Amityville tales. The new theory, of unfair competition by misappropriation of secondary meaning, has no more vitality than the other theories. I would hold that the plaintiffs cannot, as a matter of law, claim that Amityville stories are identified in the public's mind as originating exclusively with them and, since there is no precedent supporting a claim of nonexclusive secondary meaning, the trial court properly dismissed the action.

As we recognized in *Tomlin* v. *Walt Disney Productions* (1971) 18 Cal.App.3d 226, 232 [96 Cal.Rptr. 118], the protection the law affords against unfair competition by exploiting public confusion as to the source of goods or services is an exception to the policy of a free and competitive economy. That protection should not be loosely expanded, particularly when the defendant's products are literary works, for in such an instance the policy favoring freedom of artistic expression is also implicated.

The key to the case at bench is *exclusivity*, a cornerstone of the principle of secondary meaning. The rule was clearly explained in *Gordon* v. *Warner Bros. Pictures, Inc.* (1969) 269 Cal.App.2d 31, 35-36 [74 Cal.Rptr. 499], quoting from a federal case said by a treatise writer to be one of the best known and most accurate summaries of the secondary meaning rule: " 'The theory of secondary meaning contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless have been used so long *and so exclusively by one producer with reference to his article* that, in that trade and to that

---

[1] See *Lutz* v. *Hoffman* (E.D.N.Y. 1979) 4 Media L. Rptr. 2294.

branch of the purchasing public, the word or phrase had come to mean that the article *was his product; in other words, had come to be, to them, his trademark.*'" (Italics added.)

The court continued, quoting from our Supreme Court's opinion in *Academy of Motion Picture, etc., v. Benson* (1940) 15 Cal.2d 685, 690 [104 P.2d 650]: "If plaintiff proves that the name or word *has been so exclusively identified with his goods or business* as to have acquired a secondary meaning, *so as to indicate his goods or business and his alone,* he is entitled to relief against another's deceptive use of such terms, *but if he fails in such proof, he is not entitled to relief.*" (Italics added.)

The judgment should be affirmed because the record clearly shows that as a matter of law whatever secondary meaning "Amityville" had achieved *was not the exclusive property of plaintiffs.*

The public's association of Amityville with horror stories could not, at the time defendants made the second and third pictures, have been exclusively the result of the first and second books. To the contrary, the association must have been in substantial measure the result of the release of the first picture, which was a runaway commercial success because it captured the public's attention and imagination. This picture was the creation of defendants' predecessor in interest, not the Lutzes or Anson or Jones or Kimatian or Gotham Press. The Lutzes had no significant participation in the making of the picture, and the other plaintiffs had no participation in it whatever. Appellants' suggestion that they will prove at trial that The Amityville Horror is associated in the public's mind with the names George and Kathleen Lutz, is ludicrous.

Indeed, defendants have as much rights in these haunted house stories as the Lutzes, having paid the Lutzes and Anson for an interest in the copyright of Anson's book. It is astonishing that the Lutzes should sell exclusive and perpetual motion picture and television rights to the first book, *including the title "The Amityville Horror,"* to a picture company, then claim that any proprietary rights in a resulting secondary meaning of that title still belong to them exclusively. The only picture right the Lutzes held back from PFI was the right to make theatrical and television sequels depicting the Lutzes in subsequent events. And even in this reservation, the Lutzes promised PFI they would not, in the exercise of the reserved rights, depict any of the events depicted in the first book.

In addition, the public's association of Amityville with horror was not solely the result of the first two books and the first picture—the three works

in the origin of which plaintiffs are associated. The mass murder in the Amityville house and its supernatural legacy were well publicized at the time, drawing the attention of newspapers, magazines, television reports, the Church, and resulting in another book, Hans Holzer's *Murder in Amityville,* and even plaintiffs do not dare claim to be the proprietary owners of all secondary associations resulting from this publicity.

The DeFeo murders and the Amityville hauntings became topics of public interest long before defendants made the second and third pictures. A group of individuals who own two published books cannot claim to have a monopoly on the commercial exploitation of widely publicized events of public interest; such a claim is beyond the rights given them by either the copyright law or the law of unfair competition.

Lack of exclusivity of ownership is fatal to a claim of unfair competition based on secondary meaning. In *Black Hills Jewelry Mfg. Co.* v. *LaBelle's* (D.S.D. 1980) 489 F. Supp. 754, 762, three plaintiffs sued to establish their exclusive right to the use of the term Black Hills Gold Jewelry. Though granting limited relief under the Lanham Act to prevent defendants from misleading the public as to the geographic origin of their products, the court held that "to establish a secondary meaning, while it is not necessary to show that the public has become conscious of the personal identity of the manufacturer, *it must be shown that whatever is asserted to carry the secondary meaning has come to signify origin from a single, though anonymous source. [¶] In that there are three plaintiffs, there cannot be a single source of the product in question and Plaintiffs are precluded as a matter of law from establishing secondary meaning.*" (Italics added.) The Court of Appeals affirmed, noting plaintiffs did not question the trial court's conclusion on the issue. (*Black Hills Jewelry Mfg.* v. *Gold Rush, Inc.* (8th Cir. 1980) 633 F.2d 746, 749.)

Similarly, in *Universal City Studios* v. *Nintendo Co.* (S.D.N.Y. 1983) 578 F. Supp. 911, 923-926, the court granted defendant's motion for summary judgment, holding that plaintiff could not, as a matter of law, establish secondary meaning in the name King Kong, because plaintiff did not own all rights in the name and image, and not all King Kong products in the market had a single source of origin. The Court of Appeals affirmed without reaching the issue. (*Universal City Studios, Inc.* v. *Nintendo Co., Ltd.* (2d Cir. 1984) 746 F.2d 112, 115.)

Here, as in the two cases just cited, both the lack of exclusivity of plaintiff's ownership in the title Amityville and the fact that plaintiffs are not the

sole source of origin of Amityville works bar their claim based on secondary meaning.

The usual unfair competition case involving literary works presents no factual difficulty in determining what individual or business has a sufficient property right in a product or service to be able to claim protection against unfair competition. To cite just a few examples, in *Allied Artists Pictures Corp.* v. *Friedman* (1977) 68 Cal.App.3d 127 [137 Cal.Rptr. 94], plaintiff had the exclusive right to market a motion picture the title of which undisputedly enjoyed a secondary meaning. In *Jackson* v. *Universal Internat. Pictures* (1950) 36 Cal.2d 116 [222 P.2d 433], plaintiff was the author of the stage play whose title was found to have a secondary meaning. In *Gordon* v. *Warner Bros. Pictures, Inc., supra,* 269 Cal.App.2d 31, plaintiffs were the authors of a novel whose title was claimed to have a secondary meaning.

In cases where ownership was less clear, the courts have not missed the significance of the point. For instance, one of the holdings of our own decision in *Tomlin* v. *Walt Disney Productions, supra,* 18 Cal.App.3d 226, 238-239, was that an unfair competition claim based on secondary meaning may not be brought by the composer of a song who had assigned his rights in the composition to a music publisher. *Sinatra* v. *Goodyear Tire & Rubber Co.* (9th Cir. 1970) 435 F.2d 711, applying California law, rejected the unfair competition claim of a plaintiff where the copyright of the song she was famous for singing, and which defendant used without her consent, was owned by someone else.

This case is similar. The Lutzes and Anson sold PFI all motion picture rights in the first book *and in its copyright,* with the sole exception of the reserved right to make a sequel depicting the Lutzes in subsequent events. (Although the complaint alleges the reservation of all sequel rights, this allegation is clearly contradicted by the parties' written agreement.) Having licensed *The Amityville Horror* to PFI, they (and Jones, Kimatian, and Gotham Press, who came later) simply cannot show the requisite exclusivity of their interest in the title "The Amityville Horror."

Plaintiffs' contention that the Lutzes and Anson reserved, in their agreement with PFI, the right to exploit any secondary meaning of the title of the first book, by not mentioning that they were conveying that right, is disingenuous. Having conveyed all motion picture and television rights exclusively and in perpetuity to PFI, the Lutzes and Anson cannot claim that they remained the exclusive owners of the right to exploit any secondary meaning theretofore or thereafter attaching to the name Amityville. The agreement was lengthy and detailed; the only motion picture and television

rights reserved by the Lutzes and Anson were the right to make sequels depicting subsequent events in the Lutzes' lives; had the Lutzes wished to assure that PFI and its successors and assigns would make no other types of sequels, and had PFI been willing to so agree, the contract would have contained such a provision. In the face of the careful and narrow definition of the sequel rights reserved by the Lutzes, it is hard to understand how they can assert that they also implicitly reserved the right, through the doctrine of unfair competition, to prevent PFI and its assigns from making any sequels without their consent. The second and third pictures were not about the Lutzes, who had no monopoly on the creation of horror stories set in the house where the DeFeo murders occurred.

In addition, even under the theory that defendants, by the titles they gave the second and third pictures, mislabeled them as to source, any valuation of the harm plaintiffs might have suffered thereby would be totally speculative. Plaintiffs cannot be awarded a portion of defendants' profits from the second and third pictures, for any supposed "evidence" of the proportion of the profits attributable to the titling of those pictures would be mere guesswork. Similarly, plaintiffs cannot recover compensation for depreciation of the value of their own plans to make a motion picture based on the second book, for there is no way for a factfinder to determine, to even the slightest degree of probability, what profits, if any, such a picture might have produced.

Appellants' complaint is replete with sweeping factual allegations which are essential to their claims but are flatly contradicted by the terms of the agreement with PFI. For instance, they alleged, "Professional Films, Inc. was granted the right to use the title *The Amityville Horror* as the title of a motion picture version of the Amityville Book produced pursuant to the Literary Purchase Agreement, but the Lutzes reserved unto themselves all other rights to use the title." In fact, the agreement conveyed to PFI "all motion pictures rights . . . in and to the Property," and the property was defined as including the book "and the plots, themes, titles, characters and copyright thereof."

At oral argument, plaintiffs' counsel conceded that anyone, including defendants, could make more horror pictures about fictional events set in the Amityville house or about real events set in the Amityville house before the Lutzes moved there. He maintained, however, that any such picture could not be identified or promoted as a sequel to the first picture because of plaintiffs' efforts to arouse public interest in the Amityville house. This position cannot be sustained. Subsequent pictures, no matter what they were named, were in fact sequels to the first picture, that is, pictures on a

related subject which followed the first. The public knew nothing about the source of the first book other than that its author was Anson, and similarly the public knew nothing about the source of the first picture, except that those who paid attention to the credits saw that it was released by American International Pictures.

In sum, this case is nothing more than an unjustified attempt by plaintiffs to arrogate unto themselves the right to commercially exploit the name of the town of Amityville to the exclusion of the literary, artistic, and commercial worlds. An already overburdened judicial system should not be subjected to protracted litigation of claims that patently lack merit. Although the existence of secondary meaning usually raises factual questions, where, as here, the relevant facts are undisputed and are so extreme that no reasonable trier of fact could find that secondary meaning exists, the action is properly dismissed at the pleading stage. I would affirm the trial court judgment in its entirety.

Respondents' petition for review by the Supreme Court was denied September 21, 1989.